# Illinois Official Reports

## Appellate Court

---

### *In re Marriage of Turano Solano*, 2019 IL App (2d) 180011

---

| | |
|---|---|
| Appellate Court Caption | *In re* MARRIAGE OF LISA M. TURANO SOLANO, Petitioner-Appellee, and SCOTT M. SOLANO, Respondent-Appellant. |
| District & No. | Second District<br>Docket No. 2-18-0011 |
| Filed | March 8, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Du Page County, No. 17-D-1437; the Hon. Robert E. Douglas, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Daniel F. Konicek and Amanda J. Hamilton, of Konicek & Dillon, P.C., of Geneva, for appellant.<br><br>Anthony Sammarco and William J. Stogsdill, of Stogsdill Law Firm, P.C., of Wheaton, for appellee. |
| Panel | PRESIDING JUSTICE BIRKETT delivered the judgment of the court, with opinion.<br>Justices Zenoff and Schostok concurred in the judgment and opinion. |

**OPINION**

¶ 1    In this dissolution proceeding, petitioner, Lisa M. Turano Solano, filed a petition for a declaratory judgment on the enforceability of a premarital agreement (Agreement) between her and respondent, Scott M. Solano. Following a hearing on the petition, the circuit court of Du Page County found the Agreement enforceable. Respondent appeals, contending that the trial court erred by (1) denying his request to postpone the hearing on the Agreement so that he could seek additional discovery, (2) conducting an unfair hearing, and (3) determining, on the evidence allowed at the hearing, that the Agreement was enforceable. For the following reasons, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3    On December 9, 2000, the parties signed the Agreement, and on December 31, 2000, they were married.

¶ 4    The Agreement stated that each party had been represented by separate counsel and was advised "that in the absence of [the] Agreement each party could acquire rights in the other's property during marriage and upon termination of their marriage during life or as a surviving spouse." It specified that each party had read the Agreement and its attachments and was "entering into [the] Agreement voluntarily, with full knowledge of its legal and economic effect." The Agreement also stated:

> "Schedule A and the attached Exhibit set forth substantially all of [respondent's] assets and liabilities as of December 1, 2000, valued as of that date. Schedule B and the attached Exhibit set forth substantially all of [petitioner's] assets and liabilities as of December 1, 2000, valued as of that date. Both Exhibits are attached and made a part of this Agreement. Values shown are based on market quotes, appraisals or estimates, as indicated. [Respondent and petitioner] recognize that certain assets are difficult to value and agree that the Exhibits are adequate disclosures of the other's assets, liabilities and income, and the parties expressly waive any right to disclosure of the property of the other party beyond the disclosure provided. The parties further agree that it is desirable to and they shall keep the information contained in this Agreement confidential."

¶ 5    The Agreement provided criteria for distinguishing between marital property and individual property. The Agreement also specified certain items of property as petitioner's individual property, namely "[t]he Family Business Property, listed in Exhibit C, whether now owned by [petitioner] or in the future owned by [petitioner]." The Agreement provided that, if the parties' marriage should terminate for a reason other than the death of a party, neither party would have a claim to the individual property of the other.

¶ 6    Schedules A (respondent) and B (petitioner), referenced in the preceding quote, were attached to the Agreement. Each schedule stated that an exhibit was attached thereto that set forth "the approximate value of [the party's] assets and liabilities" as of December 1, 2000. Attached to Schedules A and B were the corresponding Exhibits A and B. However, on each of the exhibits, in the space for "Assets," was written, "None."

¶ 7        Schedule B had a second attachment, namely the "Exhibit C" referenced in the Agreement. Exhibit C specified certain business interests to be classified as "Family Business Property" and, therefore, as petitioner's individual property.

¶ 8        In July 2017, petitioner filed her petition for dissolution of the marriage. She relied on the Agreement as settling the parties' property classification issues. In his response to the petition, respondent alleged that the Agreement was unenforceable.

¶ 9        In August 2017, petitioner filed a demand that respondent specify in a bill of particulars the grounds on which he was challenging the enforceability of the Agreement.

¶ 10       In October 2017, respondent answered the demand. Respondent claimed that the Agreement was unenforceable because (1) "[t]he disclosure in Schedule B and Exhibit B states 'none' when the Petitioner owned extensive assets and property that were not properly disclosed to the Respondent," (2) respondent "was not informed of the legal effect of his signing the Agreement and the waiving of his rights thereunder," and (3) the Agreement was "unconscionable and unfair."

¶ 11       On November 6, 2017, petitioner filed her petition for a declaratory judgment that the Agreement was enforceable. Petitioner relied on section 7 of the Illinois Uniform Premarital Agreement Act (Act) (750 ILCS 10/7 (West 2016)), which governs the enforceability of premarital agreements. The Act is the Illinois version of the Uniform Premarital Agreement Act (Uniform Act), which was drafted in 1983. See Unif. Premarital Agreement Act, 9B U.L.A. 369 (1983). The Act applies to any premarital agreement executed on or after January 1, 1990. 750 ILCS 10/11 (West 2016). Section 7(a) of the Act provides in relevant part:

"(a) A premarital agreement is not enforceable if the party against whom enforcement is sought proves that:

(1) that party did not execute the agreement voluntarily; or

(2) the agreement was unconscionable when it was executed and, before execution of the agreement, that party:

(i) was not provided a fair and reasonable disclosure of the property or financial obligations of the other party;

(ii) did not voluntarily and expressly waive, in writing, any right to disclosure of the property or financial obligations of the other party beyond the disclosure provided; and

(iii) did not have, or reasonably could not have had, an adequate knowledge of the property or financial obligations of the other party." *Id.* § 7(a).

Petitioner observed that a challenge under section 7(a) will fail, regardless of the adequacy of the parties' asset disclosures, if the challenger fails to show that he "did not voluntarily and expressly waive, in writing, any right to disclosure of the property or financial obligations of the other party beyond the disclosure provided." *Id.* § 7(a)(2)(ii). Petitioner noted that the Agreement contained a waiver of the kind contemplated in section 7(a)(2)(ii), namely that the parties "agree[d] that the Exhibits are adequate disclosures of the other's assets, liabilities and income, and the parties expressly waive[d] any right to disclosure of the property of the other party beyond the disclosure provided."

¶ 12       In his response to the petition, respondent elaborated on his challenge to the Agreement. First, he claimed that he "did not retain counsel to review [the Agreement] and that the counsel listed therein did not inform him of the legal ramifications of the terms and conditions of [the

Agreement]." Second, respondent asserted that petitioner failed to make an adequate disclosure of her assets prior to the parties' execution of the Agreement. According to respondent, the parties agreed not to disclose any assets on Exhibits A and B because they intended that only petitioner's family business interests set forth in Exhibit C would be deemed individual property. Respondent asserted that petitioner's representation of "None" in the space for assets on Exhibit B was "false and misleading." He claimed that he "relied upon the Petitioner's inaccurate disclosure as both parties were not excluding assets from the other or from the marriage, [except for] the family bakery business ownership provided in Exhibit C, and the Petitioner's reliance at this time on the failed disclosure appears to rise to the level of concealment." Respondent asserted that he "did not have, or reasonably could not have had, an adequate knowledge of the property or financial obligations of the Petitioner, especially in consideration of the vast property that it is believed the Petitioner holds an interest in concerning her family's business enterprises."

¶ 13    In an attached affidavit, to support his assertions as to the parties' mutual understanding in executing the Agreement, respondent averred in part:

"4. Approximately 30 days prior to the marriage ceremony, Lisa presented to me [the Agreement] for execution. Lisa and I discussed [the Agreement] on several occasions prior to the execution of [the Agreement] on December 9, 2000. I did not draft [the Agreement] or the Exhibits provided therein, said documents were drafted by Lisa's attorney and provided to me.

5. The discussions concerning the [A]greement were focused on [the Agreement] being in place to provide that Lisa would maintain her ownership interest in the family bakery businesses and I would not receive stock or other ownership interest in the family bakery business due to our marriage.

6. Lisa and I further discussed our income at that time and Lisa informed me that she was a salaried employee with the family bakery business and that as part of our marriage, any money that she earned or received from the family bakery business was going to be used and shared by the parties, akin to marital income. In furtherance of her statements, throughout the marriage, Lisa's income and monies received from the family bakery businesses, in any form provided, [were] used by Lisa and I for our family and in the acquisition of marital property.

7. Prior to the execution of the Premarital Agreement, and prior to the execution of Exhibit[s] A and B, Lisa and I discussed that neither of us were providing a detailed disclosure of personal property to the other as both of us agreed that all of our personal property was going to be shared and combined together and used by both [of] us as a married unit. Accordingly, both Lisa and I provided on Exhibits A and B the word 'None' regarding the disclosure of assets and the values of same as we both intended for Exhibits A and B to reflect that nothing or no personal property was being excluded from the other party as our individual property was to be combined together when married. The only assets that were to be excluded, as provided above, was that I would not receive an ownership or stock interest in the family bakery business.

8. At no time did Lisa provide to me, prior to the execution of the Premarital Agreement, any detailed disclosure of her income, assets, debts or liabilities. I did not have knowledge or the ability to obtain knowledge regarding Lisa's property. She did not provide to me any disclosure of her specific ownership interest in the family bakery

- 4 -

business, nor did she provide to me any value of her ownership interest in the family bakery business. She did not provide to me any values of any bank accounts, financial assets, personal property or other property that she had an interest in. At the time of the execution of the Premarital Agreement I was not provided, nor was I aware of, the value of Lisa's property, personal assets, debts, obligations or the value or interest she had or may have had in the family bakery business."

¶ 14 On November 9, 2017, the trial court granted respondent 28 days (until December 7, 2017) to respond to the petition. Over respondent's objection, the court set the petition for a hearing on December 13, 2017.

¶ 15 On November 16, 2017, respondent moved to continue the hearing on the petition. Respondent claimed that he needed additional time to conduct discovery on the following issues:

"the circumstances under which the Premarital Agreement was negotiated and executed; the assets which the Petitioner had at the time of the execution of the Premarital Agreement; her earnings at that time and throughout the marriage; her interest in the substantial family business related to the Turano Baking Company business, of which she is an employee and corporate attorney; what holdings the Petitioner had at the time of the marriage, and now, in said family related businesses and how she acquired them, be it by gift or as part of her employment income, and other matters related to the negotiations for an execution of the Premarital Agreement and the lack of disclosures of information concerning the Petitioner's assets and income."

Respondent asserted that discovery was still in its "initial stages." He claimed that, although he had submitted his financial-disclosure statement and answered petitioner's requests for discovery, petitioner had failed to submit her own financial disclosure or answer discovery requests.

¶ 16 In her response to the motion to continue, petitioner argued, *inter alia*, that additional discovery was unnecessary because the parties' mutual waiver of further disclosure was of itself dispositive of respondent's assertion that he had not received an adequate disclosure from petitioner.

¶ 17 At the hearing on the motion to continue, respondent alleged that, when he signed the Agreement, petitioner had not disclosed her interest in her family's "sizable estate" and that respondent was not otherwise aware of that interest. Respondent claimed that discovery was necessary regarding the extent of petitioner's interest in the estate. The court disagreed and denied the motion to continue:

"[R]eally, what we are talking about here is what's in the four corners of a premarital agreement. And you know, the only thing I can see that we would even have testimony on would be the parties and perhaps their attorneys at the time. That would be it.

* * *

I don't see that this needs discovery. It's a pretty simple matter. We are going to keep the 12/13 hearing. And you go with what you have got because the parties are—to me, it seems like a relatively simple issue. So, despite the amount of money that's involved in it, the issue involved is relatively straightforward. So, motion is denied."

¶ 18 In moving for reconsideration, respondent disagreed with the trial court's view that the enforceability of the Agreement was a matter restricted to the four corners of the document. Respondent identified several issues involving extrinsic facts.

¶ 19 At the hearing on the motion to reconsider, the court agreed with respondent that the issues raised went beyond the text of the Agreement, but the court continued to believe that further discovery was unnecessary. Respondent's enforceability challenge could be resolved by the Agreement and the testimony "of the parties and perhaps their attorneys." The court "[could not] see what collateral people other than that would have knowledge as to whether [the Agreement] was unconscionable." The court assured respondent that, if the issues as developed at the hearing necessitated additional discovery, it would continue the hearing for that purpose.

¶ 20 At the December 13, 2017, hearing on the petition, the trial court allowed respondent to present his case first, since he had the burden of proof under section 7 of the Act. Respondent asked to open his case by calling petitioner as an adverse witness. The trial court denied the request:

"[Y]ou have to overcome the issue, first, of whether [respondent] voluntarily waived the rights before I am going to get into what [petitioner] told him or didn't tell him because if he voluntarily waived his rights, you don't have to get into that, Mr. Laraia [(respondent's counsel)].

So if you want to put your client on with regard to that issue, that is what the Court needs to hear first before I go any further than that."

¶ 21 Respondent's counsel then called respondent, who testified that he and petitioner became engaged in December 1999. The trial court sustained petitioner's objection to counsel's attempts to question respondent about whether petitioner, who was an attorney, represented them in their purchase of a home in 1999 and whether respondent made financial disclosures to petitioner in connection with the purchase. The trial court remarked to counsel:

"[W]hat I told you [to] get out of him before I go into any other issues is whether or not it's voluntary because if I decide that it's a voluntary waiver, none of this is relevant to anything.

So if you get to the issue of whether or not or what the voluntariness of the [Agreement] was, I would appreciate that."

¶ 22 Respondent testified that, in July or August 2000, the parties discussed entering into a premarital agreement. Later, in September or October 2000, petitioner presented the Agreement to him. They talked about the terms of the Agreement, and petitioner told him that the Agreement was "strictly for bakery ownership." Petitioner told respondent to read the Agreement and consult with an attorney before signing it.

¶ 23 The day after receiving the Agreement, respondent delivered it to his cousin, Vincent E. Solano, who practiced criminal law. They discussed the Agreement a week later over the phone. However, during their discussion, which lasted about two minutes, Vincent did not provide respondent any advice about the Agreement. When respondent's counsel asked respondent for the substance of what was discussed, petitioner objected, and the trial court sustained the objection. Respondent made an offer of proof as to his conversation with Vincent.

¶ 24    When the offer of proof was concluded, respondent acknowledged that he did not disclose any of his assets on the Agreement's Schedule A. When counsel asked about petitioner's disclosure of assets to respondent, petitioner objected on the ground that the question went "well beyond the issue of whether or not it was a voluntary agreement." The trial court sustained the objection. When counsel asked to make an offer of proof, the trial court responded:

> "At this point in time, *** the Court has heard enough from [respondent].
>
> And I will tell you exactly how I am going to rule and why I am going to rule. I will give you your [Rule] 304 language, if you wish.
>
> [Respondent] has testified that [petitioner] gave him the [Agreement and] told him to read it and to get an attorney.
>
> He the next day, and this is in September, the next day he got it to [Vincent], he conferred with [Vincent], although he never hired [Vincent], that is between him and [Vincent]. This is family.
>
> He didn't ask any follow up questions to [Vincent]. And then he signed the [Agreement] with everything that is in it.
>
> So the Court finds that he had adequate time, which is what the case law usually looks at: Was this presented to him the day before, or was it presented prior. It was presented [in] September prior to the December date that it was agreed to. He had three months.
>
> He was advised to get an attorney and to read it. He did get an attorney or gave it to an attorney, he conferred with the attorney, and he signed it and initialed every page.
>
> The Court finds that there is a voluntary waiver as set forth in Paragraph No. 2 and will grant the declaratory judgment."

¶ 25    The court then allowed respondent's counsel to make a lengthy offer of proof as to petitioner's disclosure of assets to respondent prior to the execution of the Agreement. When the offer of proof was concluded, counsel concluded his direct examination of respondent.

¶ 26    On cross-examination, respondent testified that petitioner did not threaten bodily harm to respondent if he did not sign the Agreement. Respondent understood that Exhibits A and B to Schedules A and B were for the parties to list property that they wanted to keep separate from each other. Respondent did not list any property on Exhibit A because the parties "were joining everything together."

¶ 27    Following his redirect examination of respondent, respondent's counsel stated that he had "nothing further." Petitioner called no witnesses of her own.

¶ 28    The trial court then made its oral ruling that the Agreement was enforceable:

> "For the reasons previously recited by the Court, but I will reiterate them, by [respondent's] testimony [petitioner] presented him [the Agreement] in September or October of [2000]. At the time that she presented it, she informed him to get an attorney and to read the document. He testified that he got the document to [Vincent] the next day. He testified to a phone call he had with [Vincent] wherein he did not ask any questions, and he proceeded to sign the document.
>
> There is nothing here that indicates that this was not voluntary on his part. He testified on cross-examination that he was not under duress and was not forced or coerced into signing.

For these reasons, the Court finds as a matter of law that [the Agreement] was not unconscionable, and the declaratory judgment is granted."

¶ 29  In its written order, the trial court found, pursuant to Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016), that there was no just reason for delaying enforcement or appeal of the declaratory judgment.

¶ 30  Respondent filed this timely appeal.

¶ 31                                II. ANALYSIS

¶ 32  Respondent raises three contentions on appeal. First, he claims that the trial court erred by refusing to postpone the hearing on the Agreement so that he could seek additional discovery. Second, he claims that the trial court conducted an unfair hearing. Third, he claims that, even on the limited record that the trial court did permit, the court erred in holding that the Agreement was enforceable. We reject all three claims of error.

¶ 33                                A. Discovery

¶ 34  We begin with the argument on discovery. The trial court has inherent authority to conduct the course of litigation. See *J.S.A. v. M.H.*, 224 Ill. 2d 182, 196 (2007). Thus, the court, in addressing a pretrial motion, can initially limit its focus to a dispositive issue and allow only the discovery that is necessary for development of that issue until it is decided. See *Yuretich v. Sole*, 259 Ill. App. 3d 311, 314 (1994) ("Motions for summary judgment can only be granted after discovery is taken, and may entail additional expense, but the trial court has the power to limit initial discovery to an issue which may be dispositive.").

¶ 35  The issue that the trial court found dispositive, and elected to address first, was the voluntariness issue. In his pleadings below, respondent appeared to make two separate assertions of involuntariness. First, he claimed that his execution of the Agreement as a whole was involuntary because he did not retain counsel to review the Agreement and advise him of its meaning and effect. His second assertion was specific to the Agreement's waiver provision, which stated that the parties "agree that [Exhibits A and B] are adequate disclosures of the other's assets, liabilities and income, and the parties expressly waive any right to disclosure of the property of the other party beyond the disclosure provided." Respondent claimed that his assent to the waiver provision was involuntary because, when the parties executed the Agreement, petitioner had not disclosed her assets.

¶ 36  Respondent's two assertions of involuntariness corresponded to sections 7(a)(1) and 7(a)(2)(ii) of the Act. Section 7(a) of the Act was adopted verbatim from section 6(a) of the Uniform Act (Unif. Premarital Agreement Act, 9B U.L.A. 369, 376 (1983)), with identical paragraph designations.

¶ 37  We quote again section 7(a) of the Act:

"(a) A premarital agreement is not enforceable if the party against whom enforcement is sought proves that:

(1) that party did not execute the agreement voluntarily; or

(2) the agreement was unconscionable when it was executed and, before execution of the agreement, that party:

(i) was not provided a fair and reasonable disclosure of the property or financial obligations of the other party;

- 8 -

(ii) did not voluntarily and expressly waive, in writing, any right to disclosure of the property or financial obligations of the other party beyond the disclosure provided; and

(iii) did not have, or reasonably could not have had, an adequate knowledge of the property or financial obligations of the other party." 750 ILCS 10/7(a) (West 2016).

¶ 38 Sections 7(a)(1) and 7(a)(2) provide what may be termed, respectively, the "involuntariness" and "unconscionability" tracks for proving a premarital agreement unenforceable. If the challenging party establishes that his or her execution of the premarital agreement as a whole was involuntary, then the agreement would be unenforceable by operation of subsection (a)(1). Alternatively, the challenging party could proceed under the "unconscionability" track but would have to prove not only that the agreement "was unconscionable when it was executed" but also that *all* of the circumstances listed in subsections (a)(2)(i), (a)(2)(ii), and (a)(2)(iii) were present "before execution of the agreement," including that he or she "did not voluntarily and expressly waive, in writing, any right to disclosure of the property or financial obligations of the other party beyond the disclosure provided." *Id.* § 7(a)(2).

¶ 39 Illinois Supreme Court Rule 201(b)(1) (eff. July 1, 2014) states that "a party may obtain by discovery full disclosure regarding any matter relevant to the subject matter involved in the pending action." Although the scope of permissible discovery is broad, it is not unlimited. *The Y-Not Project, Ltd. v. Fox Waterway Agency*, 2016 IL App (2d) 150502, ¶ 43. To protect against abuse, discovery is limited to disclosure of relevant evidence or that which will lead to such evidence. *In re Estate of Blickenstaff*, 2012 IL App (4th) 120480, ¶ 48. The trial court's refusal to postpone the hearing on the declaratory-judgment petition denied respondent additional discovery on the issues raised by the parties. A ruling denying or limiting discovery does not constitute reversible error unless the complaining party demonstrates prejudice. *Citizens Against Regional Landfill v. Pollution Control Board*, 255 Ill. App. 3d 903, 909 (1994). Normally, a discovery ruling is reviewed for an abuse of discretion. *Adler v. Greenfield*, 2013 IL App (1st) 121066, ¶ 40. Here, however, since the trial court's ruling depended on its interpretation of section 7(a)(2)(ii), our review is *de novo*. *Gunn v. Sobucki*, 216 Ill. 2d 602, 609 (2005).

¶ 40 The trial court had the authority to initially limit its consideration to the dispositive issues of whether respondent "execute[d] the [A]greement voluntarily" (750 ILCS 10/7(a)(1) (West 2016)) and whether he "voluntarily and expressly waive[d], in writing," further disclosure of petitioner's assets (*id.* § 7(a)(2)(ii)). See *Yuretich*, 259 Ill. App. 3d at 314. The court had the corresponding power to limit discovery to those dispositive issues. See *id.*

¶ 41 Our review of what discovery was permitted below is determined not only by what the trial court appropriately deemed dispositive issues but also by the scope of respondent's appellate challenge to the court's rulings on those issues. As noted, respondent's voluntariness arguments below could be construed as applying to both sections 7(a)(1) and 7(a)(2)(ii). On appeal, however, his argument is focused on subsection (a)(2)(ii). He argues not that his execution of the Agreement as a whole was involuntary (subsection (a)(1)) but that his execution of the waiver provision specifically was involuntary (subsection (a)(2)(ii)). Moreover, he argues that his waiver was involuntary because, when he signed it, (1) he did not understand its significance and (2) petitioner had not made a fair and reasonable disclosure of

her assets. As we explain below, the trial court was correct in finding that respondent voluntarily waived his right to further disclosure. *Infra* ¶¶ 44-64. To demonstrate reversible error from the denial of discovery, respondent must show that he was entitled to discovery on the specific question of whether his waiver was voluntary.

¶ 42 Notably, respondent's claim of error with respect to discovery is even narrower than his substantive challenge to the trial court's rulings on voluntariness. Respondent does not claim, for instance, that the trial court erroneously denied him discovery on whether he understood the waiver. Respondent accurately comments that, in the pleadings below, "issues were raised concerning several components of proof within section 7(a)," and he asserts that "[d]iscovery should have been allowed toward information relevant to that." Indeed, respondent asked the trial court for a continuance in order to conduct discovery on the following issues:

"the circumstances under which the Premarital Agreement was negotiated and executed; the assets which the Petitioner had at the time of the execution of the Premarital Agreement; her earnings at that time and throughout the marriage; her interest in the substantial family business related to the Turano Baking Company business, of which she is an employee and corporate attorney; what holdings the Petitioner had at the time of the marriage, and now, in said family related businesses and how she acquired them, be it by gift or as part of her employment income, and other matters related to the negotiations for an execution of the Premarital Agreement and the lack of disclosures of information concerning the Petitioner's assets and income."

However, in this appeal, the only claim that respondent develops with respect to the denial of discovery is that he was wrongfully barred from seeking information on petitioner's financial situation as it existed when he waived his right to further disclosure. He begins his argument as follows:

"[U]nder the express terms of the statute within subheading (a)(2), there are two time frames to look at: first, the time when the [A]greement was entered—whether it was unconscionable at the time it was entered—and second, during the time before the [A]greement was entered—whether it was subject to any of three identified conditions before its execution. ***

Of paramount importance then is discovery of what was actually disclosed to [respondent] by [petitioner] *before* execution of the [A]greement; what disclosure was actually, voluntarily, knowingly waived by [respondent] *before* execution of the [A]greement, beyond the disclosure already made by [petitioner]; and what constituted reasonable knowledge of [petitioner's] true financial circumstances *before* execution of the [A]greement. Significant, also, then, would be [petitioner's] actual financial circumstances, her disclosure of her financial circumstances to [respondent] before the [A]greement, and [respondent's] actual knowledge before entering the [A]greement." (Emphases in original.)

¶ 43 He continues in his reply brief:

"[Respondent's] argument below, and now on appeal, is relatively straightforward: by precepts of statutory construction, reading the language of section 7(a)(2) under its plain, ordinary, and accepted meaning, there had to be a reasonable and fair disclosure of [petitioner's] assets before entry of [the Agreement] for there to have been an express and voluntary waiver at the time of entry of [the Agreement] by [respondent] to

further disclosure of her assets. *Discovery should have been permitted toward this inquiry. Instead, it was not.*" (Emphasis added.)

¶ 44    Respondent interprets section 7(a)(2)(ii) to mean that, unless a party has made a fair and reasonable disclosure of his or her assets, the other party cannot be deemed to have voluntarily waived the right to disclosure beyond the disclosure made. Respondent argues that, since the adequacy of a disclosure must be judged by what was *not* disclosed, he was entitled to discovery on the assets that petitioner held when he agreed to the waiver provision.

¶ 45    Since the range of permissible discovery is determined by relevancy and relevancy is determined in turn by the governing law, we must examine the governing standards in section 7 of the Act. As noted, subsection (a)(2) has a series of conditions joined by two conjunctions. In order to prevail under subsection (a)(2), the party challenging the enforcement of a premarital agreement must prove not only that the agreement "was unconscionable when it was executed" but also that, "before execution of the agreement," the challenging party

> "(i) was not provided a fair and reasonable disclosure of the property or financial obligations of the other party;
>
> (ii) did not voluntarily and expressly waive, in writing, any right to disclosure of the property or financial obligations of the other party beyond the disclosure provided; and
>
> (iii) did not have, or reasonably could not have had, an adequate knowledge of the property or financial obligations of the other party." 750 ILCS 10/7(a)(2)(i), (ii), (iii) (West 2016).

¶ 46    The Agreement's waiver provision faithfully tracked the language of subsection (a)(2)(ii). The effect of the waiver becomes, then, a matter of statutory interpretation, the goal of which is to ascertain the legislature's intent. *Bank of New York Mellon v. Laskowski*, 2018 IL 121995, ¶ 12. The most reliable indicator of legislative intent is the statutory language itself when given its plain and ordinary meaning. *Id.* Issues of statutory interpretation are issues of law and so reviewed *de novo*. *Cohen v. Chicago Park District*, 2017 IL 121800, ¶ 17.

¶ 47    We have found no Illinois decision that expressly analyzes the issue of statutory interpretation raised here. We granted petitioner's motion to cite *In re Marriage of Woodrum*, 2018 IL App (3d) 170369. In *Woodrum*, the respondent challenged the parties' premarital agreement on the ground that she did not receive a fair and reasonable disclosure of the petitioner's assets. The appellate court noted that, "[u]nder the [Act], the only way that [the petitioner] could have been relieved of his statutory obligation of providing a fair and reasonable disclosure was by [the respondent] 'voluntarily and expressly waiv[ing], in writing, any right to disclosure of the property or financial obligations of [the respondent] beyond the disclosure provided.' " *Id.* ¶ 59 (quoting 750 ILCS 10/7(a)(2)(ii) (West 2016)). As the respondent did not sign any purported waiver of disclosure, the *Woodrum* court held the petitioner to his obligation of providing the respondent with a fair and reasonable disclosure. *Id.* ¶¶ 61-77.

¶ 48    As there was no purported waiver in *Woodrum*, the court was not presented with the question of what effect such a waiver would have. The *Woodrum* court did suggest that a waiver would have "relieved [the petitioner] of his statutory obligation" of disclosure, but the court provided no supporting reasons. *Id.* ¶ 59. Thus, *Woodrum* provides no analytical guidance on the issue at hand.

- 11 -

¶ 49     According to respondent, the phrase "beyond the disclosure provided" in subsection (a)(2)(ii) indicates that the extent of the *existing* disclosure, as bearing upon its fairness and reasonableness, is relevant to whether the challenging party voluntarily waived his or her right to *further* disclosure. See 750 ILCS 10/7(a)(2)(ii) (West 2016). We disagree. "If the [statutory] language is clear and unambiguous, we may not depart from the plain language and meaning of the statute by reading into it exceptions, limitations or conditions that the legislature did not express, nor by rendering any word or phrase superfluous or meaningless." *Cuevas v. Berrios*, 2017 IL App (1st) 151318, ¶ 33. Subsections (a)(2)(i) and (a)(2)(iii) provide for challenges based on the unreasonableness of the other party's disclosure of assets and on the challenging party's lack of knowledge of the other party's assets. By contrast, nothing in the text of subsection (a)(2)(ii) suggests that there must be a certain degree of disclosure, or knowledge of the party's undisclosed assets, before a party can waive the right to further disclosure. If respondent is correct that a waiver can be overcome by showing that the other party failed to make a fair and reasonable disclosure of assets prior to the waiver or that the challenging party lacked knowledge of the other party's assets, then subsection (a)(2)(ii) is essentially indistinct from the other subsections, and waivers have no independent force. The proper reading of the three subsections is that the legislature intended in subsection (a)(2)(ii) to provide for waivers that entirely forestall challenges otherwise available under the other two subsections.

¶ 50     Respondent, however, suggests that subsection (a)(2)(ii) at a minimum presupposes *some* level of disclosure before a waiver can be voluntary. But respondent suggests no criteria for judging the minimum adequacy of a disclosure apart from the criteria in subsections (a)(2)(i) and (a)(2)(iii). We cannot accept a reading that effectively conflates the three subsections. In our view, a waiver under subsection (a)(2)(ii) can be voluntary even where the other party has disclosed no assets at all.

¶ 51     We also note that the Agreement's waiver provision contains language that is stronger and more explicit than the statutory terminology. The parties not only waived the right to disclosure beyond what was given but also expressly conceded that "the Exhibits are adequate disclosures of the other's assets, liabilities and income."

¶ 52     Respondent cites several foreign authorities to support his interpretation of section 7(a)(2)(ii) of the Act. As the purpose of a uniform act is to promote consistency among jurisdictions, judicial opinions from other jurisdictions interpreting uniform acts are given greater deference than usual. *Mikrut v. First Bank of Oak Park*, 359 Ill. App. 3d 37, 56 (2005). But none of the authorities cited by respondent persuades us of his position.

¶ 53     Respondent cites the Connecticut Supreme Court's decision in *Friezo v. Friezo*, 914 A.2d 533 (Conn. 2007), to support the proposition that, "without sufficient disclosure and knowledge of a party's assets, there cannot be intelligent waiver of the legal rights being waived by the other party." But *Friezo* is inapposite because, when that case was decided, the Connecticut version of section 6 of the Uniform Act did not allow a party to waive the right to disclosure of the other party's financial information. See *id.* at 545-47 (citing Conn. Gen. Stat. § 46b-36g(a) (1995)); Amberlynn Curry, *The Uniform Premarital Agreement Act and Its Variations Throughout the States*, 23 J. Am. Acad. Matrim. Law 355, 364 (2010) ("Under section 46b-36g a party cannot waive the right to disclosure of the other party's financial information."). *Friezo* has no bearing on how to judge the voluntariness of a waiver under section 7(a)(2)(ii) of the Act.

¶ 54    Respondent also cites the Kansas Supreme Court's decision in *Davis v. Miller*, 7 P.3d 1223 (Kan. 2000). Respondent derives the following principles from *Davis*: (1) "[t]o be considered 'fair and reasonable,' pursuant to the [Act], the financial disclosure should go to a general knowledge of the nature and extent of the other party's involved property"; (2) "[t]he disclosure before execution of the agreement must approximate assets in general terms, or at least divulge the general nature of assets, without an attempt to hide or conceal assets"; and (3) "the language ***, 'beyond the disclosures provided herein,' is a waiver of any future disclosures, not a waiver of disclosures made in the past."

¶ 55    When *Davis* was decided, the Kansas version of section 6 of the Uniform Act was substantively unchanged from its source. See Kan. Stat. Ann. § 23-807 (1988). In particular, the waiver provision in the Kansas act, section 23-807(a)(2)(B), was taken verbatim from section 6 of the Uniform Act. See *id.* § 23-807(a)(2)(B) ("such party did not voluntarily and expressly waive, in writing, any right to disclosure of the property or financial obligations of the other party beyond the disclosure provided").

¶ 56    Respondent's points (1) and (2) are drawn from *Davis*'s discussion of what manner of disclosure is considered fair and reasonable. But these points are irrelevant to whether a party's waiver dispenses with the other party's obligation to provide a fair and reasonable disclosure in the first place.

¶ 57    Respondent's point (3) is more apt. He derives it from *Davis*'s discussion of the trial court's holding that the wife "waived her right to any disclosure of [the husband's] property in the settlement agreement," pursuant to subsection (a)(2)(B) of the Kansas act. *Davis*, 7 P.3d at 1233. In discussing the wife's challenge to that holding, the supreme court quoted two paragraphs from the premarital agreement. Paragraph 2 read:

> " '2. *Financial information disclosure.* "Husband" has made complete disclosure to "Wife" of his financial situation through personal and business records and through statements made at a conference of attorneys and accountants in which a transcribed record was taken on December 1, 1994.' " *Id.* at 1234.

Paragraph 3 read:

> " '3. *Waiver of additional financial information.* The parties hereto each voluntarily and expressly waive any right to disclosure of the property, financial position or obligations of the other *beyond the disclosures provided* herein and by the attachments hereto.' (Emphasis added.)" *Id.* at 1233.

¶ 58    The wife argued that, "although paragraph 3 controls the waiver of release of any *additional* financial information, paragraph 2 controls the disclosure of previous or attached financial information." (Emphasis in original.) *Id.* The court agreed with the wife, "interpret[ing] the contract to be a waiver of any *future* disclosures and not to apply to a waiver of any and all disclosures made in the *past.*" (Emphases in original.) *Id.* at 1234.

¶ 59    Respondent submits that, though *Davis* was relying on the language in the parties' agreement, the court was also indirectly interpreting subsection (a)(2)(B), in that the waiver language in the parties' agreement tracked the waiver language in the subsection. Thus, respondent claims, *Davis* supports construing a subsection (a)(2)(ii) waiver not as a concession to the adequacy of disclosures made prior to the execution of a premarital agreement but strictly as a waiver of a right to subsequent disclosures.

¶ 60    To the extent that the *Davis* court was construing subsection (a)(2)(B) of the Kansas statute as respondent claims it was, we disagree with that interpretation as extended to the Act's identically worded subsection (a)(2)(ii). There is no support in subsection (a)(2) for dividing the right to "a fair and reasonable disclosure" into disclosures already made and disclosures yet to be made. Likewise, a waiver tracking the language of subsection (a)(2)(ii) has unrestricted temporal scope. There is no intelligible way to construe a waiver of information "beyond the disclosure provided" other than as a concession to the adequacy of what, if anything, was already disclosed. In any case, the Agreement's waiver indeed contained an express acknowledgement of the adequacy of existing disclosures.

¶ 61    In his reply brief, respondent cites *In re Marriage of Bonds*, 5 P.3d 815 (Cal. 2000), to support his view of a voluntary waiver under subsection (a)(2)(ii). In *Bonds*, the California Supreme Court construed a portion of California's verbatim adoption of section 6(a) of the Uniform Act. Respondent applies *Bonds* as follows:

> "From a fair reading of the statute, [respondent] has contended a voluntary and express waiver 'before' execution of the express agreement should be measured against the actual disclosure made and any disclosures withheld before entry of the agreement. See, 750 ILCS 10/7(a)(2)(i), (ii), and (iii). [Citation.] Elements of lack of fair and reasonable disclosure, lack of express and knowing waiver, and lack of imputed knowledge together presuppose conveying an element of knowing waiver. See, *In re Marriage of Bonds*, *** 5 P.3d at 830-31. To be consistent with the purpose of discovery in Illinois, then, discovery should have been allowed to inquire into fair and reasonable disclosures before execution of the agreement, and to test whether a voluntary and express waiver had been given within the express elements of the statute. As a matter of statutory construction, this is a fair and reasonable reading of the statute."

¶ 62    Respondent misapplies *Bonds*. The issue in that case was not what makes a waiver voluntary under section 6(a)(2)(ii) of the Uniform Act, but what makes the execution of a premarital agreement as a whole voluntary under section 6(a)(1) of the Uniform Act, as adopted in California. See Cal. Fam. Code § 1615(a)(1) (West 1994) ("(a) A premarital agreement is not enforceable if the party against whom enforcement is sought proves *** the following: (1) That party did not execute the agreement voluntarily[.]"). The *Bonds* court held that "a number of factors are relevant to the issue of voluntariness" under subsection (a)(1), including

> "the coercion that may arise from the proximity of execution of the agreement to the wedding, or from surprise in the presentation of the agreement; the presence or absence of independent counsel or of an opportunity to consult independent counsel; inequality of bargaining power—in some cases indicated by the relative age and sophistication of the parties; *whether there was full disclosure of assets*; and the parties' understanding of the rights being waived under the agreement or at least their awareness of the intent of the agreement." (Emphasis added.) *Bonds*, 5 P.3d at 824-25.

¶ 63    We need not determine whether "full disclosure of assets" is, as the *Bonds* court held, integral to the voluntariness of a premarital agreement as a whole under section 6(a)(1) of the

Uniform Act and, by extension, section 7(a)(1) of the Act.[1] Respondent does not raise any issue under section 7(a)(1). His focus is on whether a party must fairly and reasonably disclose assets before the other party can be said to have voluntarily agreed to a waiver of further disclosure pursuant to section 7(a)(2)(ii) of the Act. For the reasons we have provided, we reject respondent's interpretation of section 7(a)(2)(ii).

¶ 64    To summarize, the trial court was correct to identify voluntariness as a dispositive issue in the declaratory-judgment proceedings. Respondent has shown no error in the trial court's refusal to continue the declaratory-judgment hearing for respondent to seek discovery pertaining to the voluntariness issue. Respondent's only claim of error on discovery is that he should have been allowed to seek information on whether petitioner made a fair and reasonable disclosure of assets, which respondent claims was pertinent to whether his waiver of further disclosure was voluntary under section 7(a)(2)(ii) of the Act. Respondent fails to show prejudice from the denial of discovery, because voluntariness under section 7(a)(2)(ii) does not depend on whether the other party made any kind of asset disclosure.

¶ 65                        B. Conduct of the Declaratory-Judgment Hearing

¶ 66    Respondent makes several claims of error regarding the trial court's conduct of the hearing on petitioner's petition for a declaratory judgment.

¶ 67    First, respondent contends that "[t]his matter should have gone to a full, fair hearing, with full discovery." He elaborates:

> "Here, the trial court got it backwards, relying on a waiver clause in the [A]greement to in fact exclude or limit the testimony it would hear. It should have heard the full testimony, including [petitioner's] disclosures and financials, to then determine if the written waiver was valid and effective.
>
> The court also got it backwards by relying on one point of contention for the entire hearing and restricting its entire inquiry to this one point, as opposed to allowing the case to develop fully under the evidence. The court forced the litigation on just this one point on declaratory judgment, a single point not of [respondent's] choosing, when the court also ruled [respondent] had the burden of proof."

Respondent claims that "Illinois decisions routinely demonstrate that full evidentiary hearings—along with complete discovery—resolve the issues related to enforcement of a premarital agreement." Respondent cites several decisions, appending to each citation a parenthetical description noting that a "full hearing," or a hearing on multiple issues, was held in the case. Respondent cites nothing in these cases, however, to suggest that the trial court, in considering the validity of a premarital agreement, cannot limit its initial review to dispositive issues but rather must address and decide all issues contemporaneously.

¶ 68    Respondent also claims that the trial court erred in refusing to permit him to call petitioner as an adverse witness to examine her on disclosures she made prior to his execution of the Agreement. Normally, an evidentiary ruling is reviewed for an abuse of discretion, but to the extent that the ruling is based on statutory construction, it is reviewed *de novo*. *Gunn*, 216 Ill.

---

[1]We note that some jurisdictions depart from *Bonds* in taking a narrower view of voluntariness under section 6(a)(1) of the Uniform Act. See, *e.g.*, *In re Marriage of Shanks*, 758 N.W.2d 506, 512 (Iowa 2008) (holding that the execution of a premarital agreement need not be both knowing *and* voluntary, but only voluntary, *i.e.*, free from duress or undue influence).

2d at 609. The trial court correctly viewed the voluntariness inquiry under section 7(a)(2)(ii) of the Act as distinct from whether, and to what extent, petitioner disclosed her assets to respondent prior to his waiver of further disclosure. Consequently, the trial court did not err in barring respondent from calling petitioner to testify as to disclosures.

¶ 69     Respondent's next contention has the following three paragraphs devoted to it:

> "During [respondent's] own direct examination, after the court sustained an objection to whether [petitioner] had represented [respondent] in the purchase of their home before they got married [citation], and after it sustained an objection to whether [respondent] had given [petitioner] his financial information as part of that closing [citation], the court declared, 'if I decide that it's a voluntary waiver, none of this is relevant to anything' [citation]. This statement from the court gives pause. The court is telling the litigant the case is being provisionally tried, and *if* the court decides one way, other evidence may either be relevant later, or not.
>
> Each time [respondent] attempted to discuss what [petitioner] disclosed to him about her financials in advance of contracting outside what was stated in the schedule and exhibit, counsel for [petitioner] objected. Each time, the court sustained those objections. [Citation.]
>
> [Respondent] then proceeded with an offer of proof, despite hearing that the court had already 'heard enough,' telling [respondent] 'exactly how I am going to rule and why I'm going to rule.' [Citation.]" (Emphasis in original.)

¶ 70     The foregoing is just a series of representations from the record along with respondent's commentary. Any claim of error is at best insinuated, and there is no citation to authority. A reviewing court is entitled to have the issues on appeal clearly defined with pertinent authority cited and a cohesive legal argument presented. *Walters v. Rodriguez*, 2011 IL App (1st) 103488, ¶ 5. Points not so developed are forfeited. *Id.* ¶ 6; see Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) ("[a]rgument *** shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on," and "[p]oints not argued are forfeited"). Respondent's point does not amount to argument and, therefore, is forfeited.

¶ 71     Finally, respondent cites authority that a civil litigant is entitled to a fair hearing. See *In re Marriage of Houston*, 150 Ill. App. 3d 608, 611-12 (1986). He then recaps his challenges to the trial court's discovery and evidentiary rulings that were premised on the trial court's belief that petitioner's disclosures to respondent were not relevant to whether respondent's waiver of further disclosure was voluntary under section 7(a)(2)(ii) of the Act. He also complains that the trial court "told [him] it already had its mind made up, telling him during presentation of the evidence how it was going to rule." Respondent, however, fails to demonstrate prejudice from what he perceives as the trial court's "pre-judgment" of his case. The trial court did effectively cut off counsel's direct examination of respondent, but respondent does not complain about any barred testimony other than testimony about petitioner's disclosures (which, we have held, were irrelevant to the dispositive issue before the court). Following his redirect examination of respondent, counsel rested without presenting additional evidence.

¶ 72                                    C. The Declaratory Judgment

¶ 73        Respondent contends that, even upon the limited record presented at the hearing, the trial court's judgment declaring the Agreement enforceable was erroneous. The standard of review applicable to a declaratory judgment depends on the nature of the question presented. *In re Marriage of Kranzler*, 2018 IL App (1st) 171169, ¶ 39. Questions of fact are reviewed under the manifest-weight-of-the-evidence standard, but questions of law, like the interpretation of a premarital agreement, are reviewed *de novo. Id.*

¶ 74        The trial court found that respondent's assent to the Agreement, including its waiver provision, was voluntary because he had ample time to review the Agreement, had consulted with an attorney, and was not coerced by petitioner into signing it.

¶ 75        Respondent asserts that his testimony at the hearing established that petitioner did not make a fair and reasonable disclosure, or any "real disclosure" at all, of her assets prior to his waiving the right to further disclosure. He claims that petitioner's designation of "None" on Exhibit B, where she was to list her assets, "was itself misleading, leading [respondent] to believe after a discussion with [petitioner] that it referred to the bakery stock, and that everything outside of the bakery stock would become part of the marriage once they were married." Here respondent cites not evidence admitted at the hearing but testimony he gave during an offer of proof. Respondent obviously cannot properly rely on excluded evidence to support an evidentiary challenge. Based on our interpretation of section 7(a)(2)(ii), the trial court was correct in holding that petitioner's asset disclosure, or lack thereof, was irrelevant to the dispositive issue of whether respondent's waiver of further disclosure was voluntary.

¶ 76        Respondent also refers to his testimony that he did not discuss the Agreement's waiver provision with petitioner or anyone else, including Vincent, and that he did not understand the meaning of the provision. Here again respondent cites testimony he gave during an offer of proof rather than evidence admitted at the hearing. Moreover, respondent develops no claim of error specific to the exclusion of his testimony about his understanding of the waiver provision.

¶ 77        Respondent also asserts that the basis of the trial court's ruling on voluntariness "sound[s] *** of the common-law measurements for finding a premarital agreement valid and enforceable as entered voluntarily without coercion or duress, being the determination instead for agreements before the 1990 enactment of [the Act]." Respondent cites no authority for why those "common-law measurements" should not be applied to the Act. "Voluntary" is not defined in the Act or the Uniform Act, and "if a term has a settled legal meaning, the courts will normally infer that the legislature intended to incorporate the established meaning" (*People v. Smith*, 236 Ill. 2d 162, 167 (2010)). This appeal does not require us to ascertain exactly what "voluntary" means in section 7(a)(2)(ii). For us it is enough that compelling reasons exist for holding that the voluntariness of a waiver of further disclosure under section 7(a)(2)(ii) is not determined by whether the other party has made any level of disclosure.

¶ 78                                         III. CONCLUSION

¶ 79        For the foregoing reasons, we affirm the judgment of the circuit court of Du Page County.

¶ 80        Affirmed.