2020 IL App (1st) 180418-U

THIRD DIVISION
May 20, 2020

No. 1-18-0418

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| In re MARRIAGE OF | ) | |
| | ) | |
| NIMISHA R. CHRISTIAN, | ) | Appeal from the |
| | ) | Circuit Court |
| Petitioner-Appellee, | ) | Cook County. |
| | ) | |
| and | ) | |
| | ) | No. 10 D 1703 |
| ROOSEVELT CHRISTIAN, | ) | |
| | ) | |
| Respondent-Appellee, | ) | Honorable |
| | ) | Robert W. Johnson, |
| (SAKINA CARBIDE, | ) | Judge Presiding. |
| | ) | |
| Appellant). | ) | |

_____

JUSTICE McBRIDE delivered the judgment of the court.
Presiding Justice Ellis and Justice Cobbs concurred in the judgment.

**ORDER**

¶ 1      Held:   Where the appellant attorney did not provide a complete record on appeal to support her claims of error, the order entered by the trial court denying her petition for attorney fees is presumed to be in conformity with law and have a sufficient factual basis. Based on the limited record, the trial court did not abuse its discretion in finding that the attorney had failed to establish that she and her client had entered into a written engagement agreement as required by the Illinois Marriage and Dissolution of Marriage Act.

¶ 2     Appellant attorney, Sakina Carbide, represented petitioner, Nimisha R. Christian, in various post-decree matters arising from the dissolution of petitioner's marriage to respondent, Roosevelt Christian. After withdrawing from the case, Carbide filed a petition for setting final attorney fees and costs. The trial court conducted an evidentiary hearing, which included conflicting testimony regarding whether Carbide and petitioner had entered into a written engagement agreement. Following the hearing, the court concluded, based on the credibility of the witnesses, that Carbide failed to establish the existence of such an agreement, and denied her petition for fees. In this appeal, Carbide raises several challenges to the trial court's denial of her fee petition.

¶ 3     The record shows that petitioner and respondent were married in 2004, and a judgment for dissolution of marriage was entered in 2010. On August 28, 2014, Carbide filed an appearance on behalf of petitioner. Over the next 13 months, Carbide represented petitioner in various matters including, most notably, a petition for order of protection. On September 30, 2015, petitioner advised Carbide in writing that she no longer wanted Carbide to represent her. The court entered an order terminating Carbide as counsel for petitioner, over Carbide's objection, on October 23, 2015.

¶ 4     Thereafter, on November 12, 2015, Carbide filed a two-count petition for setting final fees and costs pursuant to the Illinois Marriage and Dissolution of Marriage Act (IMDMA) and the Domestic Violence Act (DVA). The first count sought fees against petitioner, alleging that petitioner retained the services of Carbide, and had entered into an engagement agreement in which she agreed to pay fees and costs incurred on her behalf. The second count sought contribution for the fees against respondent. Carbide alleged that respondent was in a superior position to pay Carbide's fees, because he had financial resources exceeding those of petitioner. Carbide also

stated that much of the litigation and resulting fees were caused by respondent's behavior. Carbide requested that the court enter an order against petitioner and respondent requiring them to pay her reasonable attorney fees and costs totaling $74,400.

¶ 5    The matter proceeded to a multi-day evidentiary hearing, at which the court heard testimony from four witnesses.

¶ 6    On May 16, 2017, the first hearing date, Carbide provided narrative testimony. Carbide stated that she was retained by petitioner in August 2014, that petitioner signed a retainer and statement of client rights, and that petitioner signed the engagement agreement in front of Carbide. Carbide stated that petitioner agreed to a fee of $400 per hour, and that petitioner was provided a copy of her fee bill monthly "by hand."

¶ 7    Carbide testified that petitioner's native language is Gujarati, and that Carbide is also fluent in Gujarati. "Everything had to be explained to [petitioner] in Gujarati" and petitioner was "unable to understand any of the court orders *** [and] court proceedings." Carbide testified that petitioner "needed assistance with everything about her" including taxes, bills, and speaking to petitioner and respondent's minor children's school and childcare center. Carbide further stated that she made various phone calls for petitioner, and helped her with applications, including getting her "food stamps, cash assistance, benefits with regards to her electric or heating, her water bills, her internet service[,] [and] medical benefits." Carbide assisted petitioner in "trying to get her car's brakes fixed" and "trying to get her employed."

¶ 8    Carbide further testified to other work she completed in the case, including filing "several affidavits for the respondent with regards to the petition for emergency order of protection [and] *** violations by the respondent" of the order of protection. Carbide also "had to file emergency motions[,] *** petitions for rule to show cause[,] *** a motion to vacate the judgment, *** [and]

3

petitions for adjudication of indirect criminal contempt." Carbide stated that there were also "petitions and motions that [she] *** had to defend throughout the course of the proceedings between August 2014 and October of 2015, including, but not limited to, motions to compel, requests to admit, motion to quash subpoenas, *** [and] motions *in limine*." Carbide also filed "a motion for reconsideration" and "several motions to compel discovery."

¶ 9    Carbide then began outlining work completed after October 23, 2015, when her representation was terminated, and counsel for petitioner objected, stating that those fees "[we]re not under consideration" because Carbide was "not entitled to recover those fees." The court sustained counsel's objection. Carbide later clarified that she "[a]bsolutely" acknowledged that petitioner had no obligation to pay any fees after Carbide's termination, and that she was "not seeking anything subsequent to October 23 against [petitioner] directly." Carbide clarified that her position was that she could seek fees against respondent for contribution after her representation was terminated "with regards to the discovery and the ongoing litigation for [Carbide's] interim petition for fees as well as [Carbide's] petition for contribution."

¶ 10    With regard to respondent, Carbide testified that the "entire action was necessitated by the emergency order of protection" and that any fees "due and owing to [Carbide] *** are a proximate cause of *** the incidents that gave birth to the emergency order of protection." Carbide testified that after the original emergency order of protection was entered, there were five violations by respondent, for conduct including contacting petitioner through Facebook, driving by and showing a fist to petitioner when she was at the children's bus stop, and following petitioner to Carbide's office.

¶ 11    Carbide also testified that she provided "skills training" to petitioner for six hours per week, wherein petitioner would come to her office and train with Carbide's secretary. Carbide stated that

either Carbide or her secretary would "give [petitioner] various things to type, to get typing skills." Carbide testified that she taught petitioner "how to do her makeup, how to do her hair[,] [and] how to dress a little differently so she would be more sophisticated and presentable." Carbide taught petitioner "basic office skills" like managing files, "paragraphing," and "data entry." Carbide further stated that there was "never an agreement that [Carbide] was going to set off [her] fees somehow *** or that there would be any sort of compensation for that." Carbide testified that petitioner "actually told [Carbide] that [petitioner] would find a way to compensate [Carbide] for the time that [Carbide] was giving to [petitioner]" but Carbide refused. Carbide further claimed that petitioner was "not qualified to work in" Carbide's office.

¶ 12     On cross-examination, Carbide acknowledged the email address she used, and testified that SECRETATRY_1@YAHOO.COM was an email address used by petitioner. She denied, however, that petitioner created the email address at Carbide's direction. Counsel for petitioner showed Carbide an email between Carbide's email address and petitioner's email address, but Carbide stated she "was not sure" if she sent the email because Carbide later found out that petitioner "was sending emails from [Carbide's] account." She stated that petitioner "had keys to [Carbide's] office" and "passwords to [Carbide's] *** computer." Carbide denied that petitioner worked for her "as a secretary in any capacity." Counsel asked Carbide if she got any benefit from any of petitioner's work, and Carbide answered, "Absolutely not."

¶ 13     When asked whether Carbide also denied that petitioner cleaned her house and office, Carbide stated, "Absolutely. Well, okay. She cleaned my office twice"—once after petitioner's "sons vomited in the bathroom" and once after petitioner and her children were "playing in the back and they had made a mess in the garage." Carbide also stated,

"there were a couple of times when she had come over and during our meetings if

5

I was reviewing documents that she had given me, reading things, making notes, she herself -- a lot of times we would meet at my kitchen table or like at the island there and a lot of times she would just get up and she would go and she would wash my dishes."

Carbide denied that petitioner worked for her six days a week from August 2014 to September 2015. She admitted that petitioner had keys to her office and that she pet-sat for Carbide's parakeet, but she denied that petitioner ironed Carbide's clothes. Carbide also denied telling petitioner that she would drop her case if petitioner did not continue working for Carbide.

¶ 14    Carbide testified that the "break down in the relationship occurred in *** June of 2015" when Carbide became "persistent" in her request for attorney fees. Carbide stated that at that time, petitioner's outstanding bill was approximately $115,000. Carbide stated that petitioner was "supposed to have paid [Carbide] a retainer of $3,000" but she had not. Around June 2015 or a few months prior to that time, petitioner started giving Carbide "payments of $100 here or there, $500 here or there" and Carbide credited petitioner for "$3,000 for those total amounts paid over that period of time." Thereafter, in September 2015, Carbide began to believe that petitioner "was not being honest with [Carbide] with regards to a variety of different things."

¶ 15    Counsel stated that her fee of $400 per hour was reasonable because she had been licensed as an attorney since 1994, and due to the "high amount of time that [Carbide] had to spend explaining things, meeting with the client, assisting the client and all of the litigation that was required on [petitioner's] behalf." Carbide stated that she has presented several seminars, had been published in the Illinois State Bar Association and had never been disciplined by the Illinois Attorney Registration and Disciplinary Commission (ARDC).

¶ 16    Carbide stated that the fees "due and owing" totaled $177,250, representing 443.95 hours,

plus costs, and that she had an additional "13 hours of time since the invoice was presented to the court." Carbide also stated that the representation agreement allowed interest on the balance, and asked for judgment in her favor against both petitioner and respondent "as apportioned by the Court."

¶ 17    Carbide further testified that there was an ARDC complaint filed by the petitioner in February 2016, "concurrently with a full briefing of the petition for attorney fees." Carbide alleged that the timing of the ARDC complaint went to "the weight of [petitioner's] allegations" and suggested that petitioner was "attempt[ing] to avoid the payment of fees."

¶ 18    Counsel for petitioner also questioned Carbide about various weekend time entries. Regarding weekend meetings with petitioner, Carbide stated that petitioner "often met with [Carbide] on the weekend *** in [Carbide's] office. [Petitioner] was the only client [Carbide] gave that privilege to ever." Later, however, in response to a different time entry, Carbide stated that petitioner would meet with Carbide at Carbide's home, and that "if it was a Sunday, it would have been at my house. *** I wouldn't have met with her on the weekend at my office." In response to questions about other weekend time entries, Carbide stated that her records are "written contemporaneous[ly] with the work," but that they are "not inputted by [Carbide]." Carbide stated that sometimes her "writing *** is not exactly clear" and that "it could be a mistake both by [her] staff and by [Carbide] in [her] review." When asked about an entry indicating that she called the ARDC advocate hotline on a Sunday, when the hotline is not available on Sundays, Carbide stated that the date was "probably mis-noted."

¶ 19    Counsel for petitioner questioned Carbide about her billing on August 26, 2014, which indicated that petitioner was billed for 15.25 hours, and Carbide stated that it "sound[ed] correct." Carbide also admitted that on that day she assisted petitioner in filing a "pauper's petition."

Counsel questioned Carbide about another date, October 29, 2014, on which Carbide billed petitioner "almost 13 hours," and petitioner stated that it was accurate. Additionally, on September 10, 2014, Carbide billed petitioner for $600 of services, but there was no description of services performed, and Carbide stated that "sometimes, when you go from one field to another, it screws up the field or could have deleted" the entry.

¶ 20    Counsel also questioned Carbide about certain entries indicating that Carbide called the children's school regarding fees, with a notation that a check was needed for the fees "or they would be deregistered." Carbide agreed that she billed petitioner $200 for that, and counsel asked, "So this is a woman who *** according to you, can't afford to pay her kids['] own school registration fee but she can afford to have you bill $200 to do so?" Carbide objected as to relevance, stating that petitioner's "ability to pay" was not at issue, and the "only thing at issue is the reasonableness of the fees." Counsel for petitioner stated that the questions went "directly to reasonableness of the fees" where Carbide had an understanding of petitioner's "ability or income and assets" at the time Carbide was billing for the various matters. The court overruled Carbide's objection.

¶ 21    Counsel then questioned Carbide about a $1400 entry that indicated that Carbide met with petitioner regarding school fees, getting emergency assistance, public aid documents, and getting "utility bills paid before they are disconnected. Client has no hot water." Carbide agreed that she billed petitioner $1400, because it was "three and a half hours of time," and she believed that the assistance provided was "within the scope of [her] representation." Counsel questioned Carbide about other entries indicating that Carbide billed petitioner for calling an auto body shop to get petitioner's brakes fixed, and for calling to arrange access to a food pantry. Counsel asked Carbide if she was charging petitioner $400 per hour when Carbide knew petitioner was in such a dire

financial situation that she was "arranging for her to have access to a food pantry," and Carbide responded that petitioner "misrepresented" what her assets were and that she actually had "thousands of dollars coming into her account."

¶ 22    Counsel then questioned Carbide about the fact that the petition for fees stated that petitioner had not paid anything to Carbide, when she had testified at the hearing that petitioner paid $3000. Carbide stated that the "petition is incorrect as to costs and, yes, she had paid a total of $3000."

¶ 23    Counsel further questioned Carbide about why her petition for fees requested fees in the amount of $74,400, when she subsequently claimed fees based on invoices in the amount of $177,000. Counsel asked how Carbide calculated the total fees, and Carbide responded that some files, including some of petitioner's records, were stolen from her office, and that "a lot of [Carbide's] records did not exist in [Carbide's] office when [she] prepared [her] petition for attorney's fees." Carbide stated that she "had to go back to the clerk to regurgitate everything at that time." Counsel asked if Carbide's response meant that the records were "actually not created contemporaneously," and Carbide answered, "Yes, it was."

¶ 24    To explain the difference in the total listed in her fee petition and the subsequent invoice amount, Carbide stated,

> "it could have been that I added it up wrong. When I broke it down, my math could be off, but I stand by my invoice, that that is exactly what the representation was in the case. I stand by all the work that was done. I stand by my testimony that some of my dates might be incorrect."

¶ 25    Carbide further stated that "if the invoicing amount is higher than the amount that I pled in my petition, I will stand by my word on the petition and I will not seek the differential in those --

in that mathematics because if it's my mistake, I will take responsibility for it." Carbide clarified that she was "not amending [her] petition to seek that additional amount." Carbide stated that the invoice was "accurate as to each time kept in each entry" but that "[s]ome of the dates may *** be incorrect."

¶ 26    Carbide testified that she had an extremely close relationship with petitioner, and that Carbide "treated her like a sister." When asked if Carbide "loved" petitioner, Carbide answered, "I still do." When asked whether Carbide "got very personally involved in this case and with this client *** beyond just a normal attorney/client relationship," Carbide responded "I don't know how you define a normal attorney/client relationship. I care about all my clients. I will go the extra mile for all of my clients but with [petitioner] I cared about her more than I cared about any of my other clients, yes."

¶ 27    After the conclusion of Carbide's testimony, Carbide began her direct examination of petitioner. Petitioner testified that she hired Carbide in August 2014 to be her lawyer. She disagreed that she hired her for an emergency order of protection. When asked whether she filed an affidavit with the order of protection, petitioner stated, "I don't know what's going on. I just – you told me, I just follow everything." Petitioner stated that she "just want[ed] to move out of the state because the abusing [*sic*]" and she told Carbide "the story" in Gujarati. Petitioner denied that Carbide gave her an affidavit and explained it to her in Gujarati after it was typed in English. Petitioner stated that she went to court on two different days for the emergency order of protection, and she thought that the judge asked her "one or two minute question or answer." When asked whether it was true that Carbide "never told [petitioner] that [Carbide] was going to represent [petitioner] for free," petitioner answered "You told me you can help me. I can help you." Carbide moved to strike petitioner's answer, and the court responded, "Overruled. Answer stands."

Petitioner also testified that Carbide did not tell her that her fees were $400 per hour.

¶ 28    Carbide asked petitioner about certain occasions when she was in court and had an interpreter, and petitioner stated, "Every time I ask everybody because I don't understand too much." At that point, the trial court asked petitioner, "Are you understanding today?" Petitioner stated, "Little bit, not too much." The court asked, "You are understanding the questions?" and petitioner answered, "Little bit, yes." Carbide then objected, and stated that she needed petitioner to "understand the questions fully and *** to be able to respond appropriately to the questions that are asked. So either she doesn't understand and we would have to recess her testimony to a date when there is a translator present or *** if she does understand fully and completely, I have no problem with proceeding."

¶ 29    The court allowed petitioner to discuss with her counsel, and after that discussion, counsel informed the court that petitioner was "definitely concerned she [is] not going to fully understand but she's also concerned that she doesn't have the money to come back" from Virginia, where petitioner was relocating. Counsel for petitioner noted that they had "previously entered an order that would have allowed her to testify via videoconferencing or telephone or something" but Carbide objected, stating that she would not be able to "interpret [petitioner's] body language, the credibility. It would be an issue for the court to assess as well." The court stated that it was "no fault of [petitioner's] own that the interpreter who was here yesterday and knew about today didn't come," so the court was not "going to hold that against her." The court then set the matter for status on June 6, 2017.

¶ 30    The hearing apparently continued at a later date, however, no further transcripts exist in the record on appeal. In their briefs before this court, the parties generally agree that the court heard additional testimony from petitioner, as well as testimony from respondent, and another

individual, Samson Macwan.

¶ 31    Thereafter, on January 26, 2018, the court entered an order denying Carbide's petition for attorney fees. The court stated that it had "heard and considered the testimony of the witnesses" and "reviewed the entire record of this matter, including exhibits admitted into evidence." The court noted that Carbide introduced a copy of a written retainer agreement, and testified that petitioner read and signed the retainer agreement, which purportedly memorialized their agreement for Carbide to represent petitioner at an hourly rate of $400. The court further noted, however, that petitioner testified that she did not sign a retainer agreement.

¶ 32    "[B]ased on the credibility of the witnesses," the Court found that "Carbide failed to establish that counsel and client entered into a written engagement agreement at the time the client retained counsel (or a reasonable time thereafter), as required by 750 ILCS Section 5/508(c)." Accordingly, the court denied Carbide's petition for setting final fees and costs.

¶ 33    Carbide filed a timely Notice of Appeal from that order on February 26, 2018. See Ill. S. Ct. R. 303(a)(1) (eff. July 1, 2017)) ("The notice of appeal must be filed with the clerk of the circuit court within 30 days after the entry of the final judgment appealed from"); 5 ILCS 70/1.11 (West 2016) ("The time within which any act provided by law is to be done shall be computed by excluding the first day and including the last, unless the last day is Saturday or Sunday or is a holiday as defined or fixed in any statute now or hereafter in force in this State, and then it shall also be excluded.").

¶ 34    In this court, Carbide raises various challenges to the trial court's order denying her petition for attorney fees. However, before turning to the merits of Carbide's challenges, we must comment on the state of appellant's brief and the record on appeal.

¶ 35    We initially note that Carbide's brief fails to comply with Supreme Court Rule 341

requirements. Ill. S. Ct. R. 341 (eff. May 25, 2018). In particular, subsection (h)(6) requires a statement of facts in order to provide this court with the facts necessary for an understanding of the case, "without argument or comment, and with appropriate reference to the pages of the record." Ill. S. Ct. R. 341 (h)(6) (eff. May 25, 2018). Carbide's fact section consists of one paragraph, approximately one half of one page long, and it does not provide this court with the facts necessary for an understanding of the case.

¶ 36    Moreover, pursuant to subsection (h)(7) of Rule 341, plaintiff was required to state her argument on appeal, and to support it with citation to the record and authority. Ill. S. Ct. R. 341 (h)(7) (eff. May 25, 2018).  For most of Carbide's claims of error, she merely states a legal conclusion and fails to set forth any cogent argument or legal support for her position. See *Holzrichter v. Yorath*, 2013 IL App (1st) 110287, ¶ 80 ("This court is not a depository in which the burden of argument and research may be dumped."). A reviewing court is entitled to have the issues on appeal clearly defined with pertinent authorities cited and a cohesive legal argument presented. *In re Marriage of Solano*, 2019 IL App (2d) 180011, ¶ 70. "The failure to elaborate on an argument, cite persuasive authority, or present a well-reasoned theory *** results in forfeiture of the argument." *Trilisky v. City of Chicago*, 2019 IL App (1st) 182189, ¶ 54.

¶ 37    Carbide claims to challenge many of the trial court's actions, however, she merely lists most of these alleged errors and fails to provide adequate argument, and/or citations to authority, in support of any of those claims. Specifically, Carbide contends that the court erred in "recognizing [the] representation agreement," in allowing electronic testimony, in allowing the parties to present the details of settlement offers, in denying her request for a continuance, and in allowing questioning regarding petitioner's ability to pay. Carbide further contends that the court abused its discretion in denying her motions *in limine* against petitioner and respondent, in "failing

to hear and decide" her motions to compel respondent's discovery, and in denying her motion to invalidate the transfer of respondent's property. Carbide additionally asserts that the court erred in denying Carbide's motion to disqualify petitioner's counsel, and in allowing inquiry into Carbide's fee bill subsequent to the date of withdrawal. Finally, Carbide contends that the trial court erred in denying her request to strike petitioner's testimony, "You told me you can help me." In light of Carbide's failure to provide citation to persuasive authority and well-developed argument on these claims of error, we decline to review them.

¶ 38    Carbide also includes arguments that find no support in the record on appeal. In particular, Carbide claims that the trial judge engaged in various improprieties, including that the judge "insisted on speaking off the record," "threatened [Carbide] to withdraw her petition," and told "opposing counsels that it would not grant the fee petition." Carbide further argues that the court "act[ed] as attorney for [petitioner]," which was "indicative of bias against [Carbide]." Carbide also maintains that the trial court "misled [Carbide]" by telling her that it "wanted its own court reporter, as the court wanted its own transcript." Carbide contends that she relied on the court's statement, appearing without a court reporter, but that the court did not ultimately make a court reporter available. Finally, Carbide contends that the trial court refused to return her exhibits, and was "attempting to *** delay the filing of appeal *** to ensure a dismissal of same."

¶ 39    We find no support for Carbide's claims in the record on appeal. "A trial judge is presumed to be impartial, and the burden of overcoming this presumption rests on the party making the charge of prejudice." *Eychaner v. Gross*, 202 Ill. 2d 228, 280 (2002). Carbide offers no evidence in support of her allegations, and nothing in the record supports her claim that the trial judge inappropriately "spoke off the record," "threatened" or "misled" Carbide, attempted to prevent Carbide's appeal, or otherwise was biased against her. Although the trial court denied Carbide's

petition for fees, "[a]llegedly erroneous findings and rulings by the trial court are insufficient reasons to believe that the court has a personal bias for or against a litigant." *Id.*

¶ 40    Despite these deficiencies in Carbide's appellant brief, in her reply, she asks this court to strike substantial portions of petitioner's and respondent's response briefs, for their own alleged failures to comply with Rule 341. Carbide contends that the response briefs contain various defects, including erroneous citations, arguments without citation to legal authority, facts that are not included in the record or supported by record citations, and "fabrications."

¶ 41    "Where violations of supreme court rules are not so flagrant as to hinder or preclude review, the striking of a brief in whole or in part may be unwarranted." *Merrifield v. Illinois State Police Merit Board*, 294 Ill. App. 3d 520, 527 (1997). We conclude that any violations of the supreme court rules in the briefs of petitioner and respondent do not hinder our review of the case, particularly where, as here, we have reviewed the record as a whole in addressing Carbide's arguments. However, this court will not consider any facts outside the record, or any claims based on such facts. See *Kildeer-Countryside School District No. 96 v. Board of Trustees of Teachers' Retirement System of State*, 2012 IL App (4th) 110843, ¶ 21. Accordingly, we deny Carbide's request to strike sections from the response briefs.

¶ 42    In addition to the deficiencies in briefing, our review is further hindered by the inadequate record filed in this appeal. Our supreme court has recognized that to support a claim of error, an appellant has the burden to present a sufficiently complete record. *Corral v. Mervis Industries, Inc.*, 217 Ill. 2d 144, 156 (2005). In the absence of such a record on appeal, we presume that the order entered by the trial court was in conformity with the law and has a sufficient factual basis. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984); *Teton, Tack & Feed, LLC v. Jimenez*, 2016 IL

App (1st) 150584, ¶ 19. Any doubts arising from the inadequacy of the record must be resolved against Carbide, as the appellant. See *Corral*, 217 Ill. 2d at 157.

¶ 43    The record on appeal in this case contains a transcript of one day of the evidentiary hearing, during which Carbide testified, and petitioner began her testimony before the court and the parties concluded that it was necessary for petitioner to continue her testimony with an interpreter. There is no transcript or acceptable substitute for the rest of the proceedings. See Ill. S. Ct. R. 323(c), (d) (eff. July 1, 2017) (noting that in lieu of a trial transcript, an appellant may file a bystander's report or an agreed statement of facts).

¶ 44    Carbide attempts to remedy at least a portion of the missing transcripts, by including a "bystander's affidavit," in which she personally swears to the content of the testimony provided by one of the other witnesses who testified during the evidentiary hearing, Samson Macwan. Carbide's "bystander's affidavit" is not a bystander's report as allowed by Supreme Court Rule 352(c).

¶ 45    The purpose of a bystander's report is to serve as a substitute for a verbatim transcript of court proceedings. See Ill. S. Ct. R. 323(c) (eff. Dec. 13, 2005). A bystander's report must comply with Supreme Court Rule 323(c) (*City of Pekin v. Mann*, 44 Ill. App. 3d 1, 2 (1976)), which provides that:

> "If no verbatim transcript of the evidence of proceedings is obtainable the appellant may prepare a proposed report of proceedings from the best available sources, including recollection. *** [T]he appellant shall, upon notice, present the proposed report or reports and any proposed amendments to the trial court for settlement and approval. The court, holding hearings if necessary, shall promptly settle, certify, and order filed an accurate report of proceedings. Absent stipulation, only the report

16

of proceedings so certified shall be included in the record on appeal." Ill S. Ct. R. 323(c) (eff. July 1, 2017).

¶ 46    "An attorney's affidavit cannot be used to supplement the record in lieu of a transcript or a bystander's report." *Landau & Associates, P.C. v. Kennedy*, 262 Ill. App. 3d 89, 91 (1994). "In the absence of some designation on the document that the judge certified the facts recited therein to be accurate, the document may not be considered a bystander's report." *People v. Gerwick*, 235 Ill. App. 3d 691, 693 (1992). "To permit an appellant to proceed in an appeal upon a bystander's report based solely upon his interpretation of the evidence and memory as to what happened during the trial, without acknowledgement by the appellee, and with complete disregard of the trial judge's duty to settle and certify the report serves to thwart the purpose and intent of Supreme Court Rule 323(c)." *Mann*, 44 Ill. App. 3d at 2.

¶ 47    Here, there is no indication that the trial court certified Carbide's proposed "bystander's affidavit." To the contrary, the record shows that the trial court denied her request for "admission" of her "bystander's affidavit" on November 27, 2017. Because the purported bystander's report was not certified, it should not have been included in the record on appeal. Carbide's reliance on her own affidavit, attesting to her own "interpretation of the evidence and memory as to what happened," is not well taken. *Id.* at 2.

¶ 48    The absence of a comprehensive record precludes us from assessing the claims of error raised by Carbide. Specifically, in this court, Carbide does not challenge the trial court's determination that a written engagement agreement was required to permit her to recover attorney fees against petitioner. See *In re Marriage of Pavlovich*, 2019 IL App (1st) 180783, ¶ 23 ("The language of section 508 is abundantly clear: a written agreement between the party and the attorney is required before a party's former attorney will be permitted to recover attorney fees on a petition

brought under section 508."). Carbide merely challenges the trial court's credibility determinations, apparently arguing that the trial court should have rejected petitioner's testimony and concluded that such a written agreement existed.

¶ 49    Carbide contends that the trial court "clearly erred in finding any credibility of [petitioner], as the record is clear that she was far from credible." Carbide asserts that petitioner repeatedly "deflect[ed]" or "evade[d]" the questions, claiming she did not understand the proceedings, or understand English. Carbide contends that petitioner "understands English, but uses language as a shield when she wishes to deflect questions and responsibility." Carbide further alleges that the record shows that petitioner is not credible because she "willfully violates court orders, and \*\*\* clearly places her minor children in danger and allows harm to them."

¶ 50    Even if we were inclined to second guess the trial court's rulings on credibility, which we generally will not do (see *Best v. Best*, 223 Ill. 2d 342, 350–51 (2006) ("A reviewing court will not substitute its judgment for that of the trial court regarding the credibility of witnesses, the weight to be given to the evidence, or the inferences to be drawn.")), we could not do so in this case. We have only a limited transcript of petitioner's testimony, from only the beginning of her testimony before it became clear that it was necessary for petitioner to continue her testimony with the assistance of an interpreter. Accordingly, we have no basis on which to find that the trial court's evaluation of petitioner's credibility was an abuse of discretion. See *Gakuba v. Kurtz*, 2015 IL App (2d) 140252, ¶ 22 (the presumption that the court acted properly in the absence of a complete record applies "especially" when the standard of review is abuse of discretion).

¶ 51    We also reject Carbide's contention that the trial court erred in failing to rule on her request for contribution from respondent under the DVA. Although the court did not explicitly mention Carbide's claim against respondent in the written order, the court denied Carbide's petition, which

included her claims against both petitioner and respondent. As stated previously, we do not have any transcripts from the remainder of the hearing, and accordingly, we do not know what respondent testified to, or whether the trial court made any specific findings regarding Carbide's claims against respondent. Nonetheless, Carbide's claim is premised on section 60/214(b)(13) of the DVA (750 ILCS § 60/214(b)(13) (West 2016)), which provides that one of the remedies available to a petitioner who has been abused by a family or household member is that the court may order "respondent to pay petitioner for losses suffered as a direct result of the abuse ***. Such losses shall include, but not be limited to, *** reasonable attorney's fees, [and] court costs." Pursuant to the plain language of this statute, petitioner must have suffered losses before respondent is ordered to pay petitioner for those losses. Here, where the court found petitioner was not required to pay any attorney fees to Carbide, petitioner did not have losses for which respondent could be liable. See *In re Marriage of Magnuson*, 156 Ill. App. 3d 691, 702 (1987) (concluding that where section 508(a) of the IMDMA allows fees "necessarily incurred" by one spouse to be paid by the other spouse based on their relative abilities to pay, "an award for attorney fees cannot be based on any amount which exceeds the amount for which [the first spouse] herself could be held liable.")

¶ 52    Carbide's claims that the court erred in denying her petition for disgorgement against respondent's counsels, and in failing to grant her petition to stay respondent's counsel's petition for fees until after the hearing on her attorney fees, also fail for the same reason. Where, as here, Carbide is not entitled to attorney fees for her representation of petitioner, there is no possible basis for disgorgement of fees from respondent's counsels.

¶ 53    Finally, Carbide contends that the court erred in "allowing affirmative defenses" because petitioner "never filed an answer, response, counter affidavit or affirmative defense to [Carbide's]

petition for fees." It was, however, Carbide's burden to establish the existence of a retainer agreement to support her claim for attorney fees, and petitioner's denial of the agreement's existence is not an affirmative defense that must be raised in a responsive pleading or waived. See *Northbrook Bank & Trust Co. v. 2120 Div. LLC*, 2015 IL App (1st) 133426, ¶ 14 ("An affirmative defense assumes that the defendant would otherwise be liable, if the facts alleged by the plaintiff are true, but asserts new matter by which the plaintiff's apparent right to recovery is overcome. An affirmative defense is comprised of allegations that do not negate the essential elements of the plaintiff's cause of action, but rather admit the legal sufficiency of the cause of action, and assert new matter by which the plaintiff's apparent right of recovery is defeated." (Citations omitted)).

¶ 54    In sum, because Carbide failed to include in the record all of the relevant evidence that was presented to the trial court, as the trier of fact, we cannot possibly conclude that the trial court clearly abused its discretion in denying her fee petition. This conclusion holds especially true here, where the limited record we have reveals a multitude of factual issues before the court, regarding not only whether a retainer agreement existed, but whether petitioner was aware of Carbide's hourly rate and agreed to representation at that rate, whether petitioner worked for Carbide in exchange for legal services, whether Carbide accurately recorded fees, whether the fees and representation provided by Carbide were reasonable, and whether Carbide inappropriately charged petitioner for matters outside of the scope of representation. Because Carbide has not provided a sufficient record to support her claims of error, this court must presume that the circuit court acted in conformity with the law and ruled properly after considering the evidence before it. *Webster v. Hartman*, 195 Ill. 2d 426, 433-34 (2001); *Foutch*, 99 Ill. 2d at 391-92.

¶ 55    For the forgoing reasons, we affirm the judgment of the circuit court of Cook County. [1]

¶ 56    Affirmed.

_____

[1]    In so holding, we note that Carbide filed two motions before this court, which were ordered taken with the case. First, Carbide filed a motion to clarify our order granting her motion to correct and redact the record to remove a document that was "interjected improperly" into the record. This court has not considered the allegedly erroneously included document, and accordingly, we deny Carbide's motion to clarify as moot.

Second, Carbide filed a motion to strike the supplemental record filed by petitioner and for sanctions. Carbide contends that petitioner failed to provide notice of her motion to supplement, failed to provide Carbide with the supplemental record, and included "notes, marks, negative commentary, and other superfluous matter" in violation of a trial court order prohibiting such markings. Carbide asks this court to strike petitioner's supplemental record, and to order petitioner to pay the attorney fees and costs incurred in bringing the motion. Petitioner responds to Carbide's motion, contending that the supplemental record contains petitioner's exhibits from the evidentiary hearing, and it was Carbide who failed to include the exhibits in the record on appeal. Petitioner contends that through Carbide's motion, she attempts "to withhold from this Court a full and complete Record upon which to adjudicate Carbide's appeal." This court has not considered the supplemental record filed by petitioner, and accordingly, Carbide's motion to strike the supplemental record and for sanctions is denied as moot.