2023 IL App (1st) 230271-U

No. 1-23-0271

Second Division
December 5, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| | ) | Appeal from the |
| CHYVETTE A. VALENTINE, | ) | Circuit Court of |
| | ) | Cook County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 22 CH 09185 |
| | ) | |
| CHICAGO HOUSING AUTHORITY, | ) | Honorable |
| | ) | Eve M. Reilly, |
| Defendant-Appellee. | ) | Judge, Presiding. |

JUSTICE COBBS delivered the judgment of the court.
Justices McBride and Ellis concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Appellee's motion to dismiss, which was taken with the case, is denied. We affirm the termination of appellant's housing voucher following an administrative hearing, finding that the decision to terminate was not clearly erroneous.

¶ 2    Plaintiff-appellant Chyvette Valentine was provided housing assistance by defendant-appellee Chicago Housing Authority (CHA) pursuant to the Housing Choice Voucher (HCV) program. Following an informal hearing, Valentine's voucher was terminated based on two HCV program violations. On administrative review, the circuit court affirmed CHA's termination

decision. Valentine, proceeding *pro se*, now appeals from the circuit court's decision, arguing that CHA's termination decision was clearly erroneous, and that the termination violates her rights and protections under Violence Against Women Act (VAWA) (34 U.S.C. §§ 12291 *et seq* (2018)). For the reasons that follow, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4      The HCV program is a federal low-income housing assistance program administered by the CHA on behalf of the United States Department of Housing and Urban Development (HUD). The program operates pursuant to section 8 of the United States Housing Act of 1937 (Housing Act). 42 U.S.C. § 1437f (2018). Under the program, "HUD pays rental subsidies so that eligible families can afford decent, safe, and sanitary housing." In Chicago, the program is administered by CHA. 24 C.F.R. § 982.1(a)(1) (2015). Once a participant is approved, CHA provides HCV program participants with vouchers to rent properties in the private market. 24 C.F.R. § 982.302(a).

¶ 5      On November 18, 2021, Valentine was issued a voucher, which she signed. The voucher, as well as the HCV addendum, set forth the rules of the HCV program, also known as the family obligations. Participants must abide by the HCV program rules to participate in the program and a violation of the rules may result in termination from the program. See 24 C.F.R. §§ 982.441-553.

¶ 6      On June 21, 2022, CHA sent Valentine an intent to terminate (ITT) notice. She immediately requested an informal hearing. On July 29, 2022, an amended ITT notice was sent to Valentine. It set forth the following allegations and included attachments of the e-mails referenced therein.

¶ 7      According to the ITT notice, in April 2022, CHA learned of a marketing e-mail that Valentine sent to numerous recipients, including CHA personnel, advertising Maid 2 Order, a cleaning service. After further investigation, "unreported business income was discovered along

with unreported business licenses for Sunday's Bed and Breakfast LLC, Sunday's Catering, Concessions, and Events, and Maid 2 Order LLC.

¶ 8 The ITT notice further stated that, on May 26, 2022, and June 2, 2022, CHA sent Valentine notices requesting business documents related to the above-listed businesses. The notices requested: all current business income from those businesses; 2018 to 2021 IRS tax transcripts; and all business records for any and all businesses that Valentine currently had. According to CHA, as of June 21, 2022, the requested documents had not been submitted.

¶ 9 The ITT notice also stated that, on July 28, 2022, and July 29, 2022, Valentine "sent threatening [e-mails] to CHA staff stating that CHA staff has been committing conspiracy to cause harm [and/or] commit fraud against [Valentine]." The attached e-mails showed the following. Valentine sent an e-mail to the Chicago police, as well as a number of CHA personnel and contractors. The e-mail first referenced Shalisa Harvey, a CHA contractor, stating: "For all practical purposes, Ms. Doreen admits I was referred to her by Shalisa Harvey, further proving conspiracy to cause harm and/or commit fraud while employed by CHA." The remainder of the e-mail read: "Question: Have you ever looked into the eyes of a shooter? Might make you piss yourself in fear, you feel me?". There was also a follow-up e-mail containing a link to a YouTube video. On July 29, 2022, Valentine sent an e-mail to Harvey and Renica Frills, also a CHA contractor. The e-mail accused Harvey of criminal harassment, suggested that Valentine knew Harvey's home address, and warned that Valentine had a background in private investigation.

¶ 10 The ITT notice stated that these incidents were violations of several HCV family obligations, including threats and abusive or violent behavior towards CHA personnel or contractors; information provided to the CHA must be true and complete; report all changes in income within 30 days; and fraud. The notice informed Valentine of her rights (1) to a hearing,

(2) to have representation at that hearing, and (3) to examine all documentation related to the proposed termination.

¶ 11 An informal hearing was scheduled for August 24, 2022. A notice of the hearing date was sent to Valentine. The notice informed Valentine of the following: that she could request the hearing be rescheduled; and, that she had the right to (1) examine any CHA documents related to the hearing, (2) be represented by counsel, (3) bring any witnesses, and (4) receive a written decision within 30 days; and all documents to be utilized during the hearing must be submitted by the day prior to the hearing.

¶ 12 The informal hearing took place on August 24, 2022, before an independent hearing officer, Margaret Fitzpatrick. Valentine was present and participated in the hearing. Valentine confirmed that she received the document package from the CHA prior to the hearing. The CHA presented the following evidence.

¶ 13 Marlena Brown testified that she is employed with Nan McKay as a supervisor for the program integrity department. Nan McKay is contracted to do work on behalf of CHA. Brown testified that she was familiar with Valentine's file with CHA, and she identified the relevant documents submitted by CHA. She also testified that, based on her review of Valentine's file, Valentine did not timely submit the requested documents and did not timely and accurately report business and self-employment income.

¶ 14 The voucher issued to and signed by Valentine on November 18, 2021, contains the "Obligations of the Family," which includes a requirement to provide any information to the CHA related to family income when requested and to provide information that is complete and true. The HCV addendum to the voucher provides that any violation of the rules of the program may result in termination of housing assistance. The addendum again provides that a family must supply

information that is true and complete when requested, including information related to income. It also requires, *inter alia*, a family to notify the CHA of any changes in income within 30 days and proscribes a family from committing fraud and threatening or engaging in abusive or violent behavior towards CHA personnel, representatives, or contractors. The addendum defines abusive or violent behavior as verbal or physical abuse or violence, as well as racial epithets or other language intended to intimidate. Threats are defined as "oral or written threats or physical gestures that communicate intent to abuse or commit violence." Valentine also signed the addendum. Brown further testified that, at the time a voucher is issued, the CHA explains in detail the family obligations to participants.

¶ 15    Also introduced was the Housing Assistance Payments (HAP) Contract and an Application for Continued Eligibility. The latter was signed by Valentine on October 8, 2021, which certified that she "read and signed the Housing Choice Voucher Program Voucher and Addendum." On the application, Valentine indicated that her income as of 2021 was unearned benefits in the amount of $10,868. She did not report any business income or self-employment.

¶ 16    The CHA submitted a copy of an April 16, 2022 e-mail with the subject line, "Grand Opening Maid 2 Order, LLC, Chicago." It showed the sender as "Maid 2 Order Cleaning" but listed Valentine's name at the end of the body of the e-mail. The e-mail stated that Valentine was "looking to secure contracts for cleaning" and "Maid 2 Order [was] looking for a commercial location to store, house, reproduce, and ship organic cleaning products." The e-mail was sent to dozens of e-mail addresses including CHA personnel and contractors. It also included a flyer for Maid 2 Order.

¶ 17    There was a printout from the Office of the Secretary of State's Corporation Search showing that Maid 2 Order was an active limited liability company with Valentine as its agent and its organization date as April 7, 2022. That search occurred on April 18, 2022.

¶ 18    There were also printouts from a website for Sunday's Catering, Concessions and Special Events (Sunday's Catering). The website advertised catering, security services, limo rentals, and vacation packages. The security services page claimed that the business's bodyguards were firearm certified. Additionally, there was a document showing a Facebook posting with promotional information for Sunday's Catering. This information was retrieved on April 18, 2022.

¶ 19    A document titled "Articles of Organization" was submitted, and it identified the entity as Sunday's Bed and Breakfast, LLC and Valentine as its agent. Also included was a printout from the Arizona Corporation Commission, providing the business entity information for Sunday's Bed and Breakfast, LLC. It listed the formation date as February 7, 2017 and showed that the entity was active and in good standing. This information was retrieved on April 18, 2022.

¶ 20    The CHA also submitted two "Documents Outstanding Notice[s]" that were sent to Valentine. Both notices requested that Valentine submit all current business income from Sunday's Bed & Breakfast, Sunday's Catering, and Maid 2 Order, IRS tax transcripts from 2018 to 2021, and any business records for any current businesses. The first notice stated that the deadline to submit the documentation was June 6, 2022, and the second notice had a deadline of June 12, 2022. Both notices indicated that failure to comply would result in an ITT notice.

¶ 21    There were also documents from the circuit court of Cook County showing that Harvey sought an order of protection against Valentine, and, on August 2, 2022, the circuit court issued a civil no-contact/stalking order against Valentine.

¶ 22 Finally, the CHA submitted its "Memo Review" which showed CHA staff notes related to contact with Valentine. During the hearing, the CHA highlighted the entry from December 13, 2021, which stated that Valentine's recertification was complete and her self-certification resulted in tenant rent of zero dollars. In various notes, Valentine is described as "very hostile," "irate," yelling at CHA staff, repeatedly using "inappropriate" or "vulgar" language, "confrontational," and "aggressive."

¶ 23 Renica Frills also testified on CHA's behalf. She testified that she was employed by Nan McKay as assistant deputy director. In that position, she is responsible for overseeing the program integrity department. She confirmed that she was familiar with Valentine's file. She testified she was copied on the July 28, 2022 e-mail and she also listened to Valentine's video posted on her public YouTube profile, which was linked in the same e-mail thread. The recording was of a conversation between Valentine and CHA personnel, Doreen Green. Frills testified that she saved the video, which was about 22 minutes long. Around 19 minutes into the recording, Valentine made threats towards CHA personnel. Specifically, Frills testified that Valentine used "very vulgar language toward CHA personnel and told her that she would beat her like her child." After Valentine objected to the testimony and later testified that she did not make that statement, that portion of the recording was played, which confirmed Frills' testimony. The transcript from the hearing shows that Valentine stated that she "would beat [Green] like her child." Frills then testified that she was aware of Harvey's court order of protection against Valentine, and since August 2, 2022, she had received or been copied on 15 to 20 e-mails from Valentine which were also sent to Harvey.

¶ 24 Valentine testified on her own behalf as follows. Her July 28, 2022 e-mail was not directed at Harvey but at the police because she had recently witnessed a shooting near her address. She

admitted that she did make the statements on the recording but she made them because she was under duress due to the recent shootings. All of her income was reported to the CHA and she submitted banking statements to the CHA in May 2022. She claimed that, other than Maid 2 Order, none of her businesses were operational and she had no business records for them. She further stated that Harvey advised her to submit business records after she had three months of statements.

¶ 25    On cross-examination, Valentine testified that she registered Sunday's Bed and Breakfast and Sunday's Catering when she lived in Arizona but she intended to transfer those businesses to Illinois and kept the website updated with her current contact information. Those businesses were non-operational, but she admitted that Maid 2 Order began operation in April 2022 and was operational at the time of the hearing. She stopped her private security business in 2012. She denied that her e-mails to Harvey were threats, and instead, she sent the e-mails because she wanted Harvey to stop harassing her. She claimed that the context of the July 29 e-mail was that, while she was staying at a hotel, a man who claimed to know Harvey spoke to her and thus, she believed Harvey was stalking her. Valentine admitted that she was present when the court entered the order of protection against her but she believed it to be wrong because the July 28 e-mail was directed towards the police, not Harvey.

¶ 26    The record for the hearing remained open until August 26, 2022, to allow Valentine to provide two e-mails, one dated May 20, 2022, and the second dated July 27, 2022. The hearing officer expressly allowed Valentine to submit those two e-mails in order to support her arguments regarding her submission of documents to the CHA and to provide context for the July 28, 2022 e-mail. The hearing officer received those documents and marked them as exhibits.

¶ 27    In particular, the July 27 e-mail, which was sent to the Chicago police as well as a number of CHA personnel, stated: "I am waiting on said relocation…Afterward, I shall be filing formal

reports for activities relating to/possibly involved in crimes and/or conspiracy to cause harm." Attached to the e-mail were a number of photographs. The next e-mail in the same thread with the same recipients referenced the CHA's bias and harassment against her and also stated: "I am standing and looking at a shooter, while NBA fans who cannot handle a loss, stand waiting for my remain[*sic*] to fall like carcasses from the sky."

¶ 28    In a footnote to the decision, the hearing officer noted that Valentine also submitted other documents, including her VAWA documentation, an updated copy of Harvey's order of protection, and other e-mails that the hearing officer considered irrelevant.

¶ 29    After receiving Valentine's additional documentation, the CHA submitted a response. In regards to Valentine's submission of e-mails to Harvey showing that Valentine had submitted tax information, the CHA stated that the information submitted was not sufficient to comply with CHA's requests. Specifically, Valentine had submitted IRS tax returns for 2018, 2019, and 2020; however, the CHA required IRA tax transcripts to be submitted because tax returns can be self-prepared and does not necessarily indicate that the document was submitted. The tax returns were also not dated or signed, suggesting that they were self-prepared. Additionally, Valentine did not submit any documentation regarding her taxes for 2021. The CHA argued that the other e-mails submitted by Valentine were not responsive or were irrelevant to the issues involved in the hearing. Finally, in response to Valentine's argument that she was protected from termination due to her VAWA status, the CHA submitted a statement from Jessica Mellon, CHA Fair Housing Director. In this statement, Mellon stated that she was familiar with Valentine's VAWA claims and there was "no nexus between [Valentine's] VAWA claim and her failure to report business income to CHA, failure to provide requested documents to CHA, or her oral and written threats that communicate intent to abuse or commit violence toward CHA and its vendor staff."

¶ 30    The hearing was adjourned on August 30, 2022.

¶ 31    On September 16, 2022, the hearing officer issued a recommended termination decision. The hearing officer found that Valentine's testimony was "less than credible and highly charged" and Valentine repeatedly volunteered information that was not relevant to the charges at issue. The hearing officer also noted that Valentine was "easily angered and often combative" during the hearing. The hearing officer determined that the CHA had established by a preponderance of the evidence that Valentine engaged in abusive or violent behavior towards CHA personnel based on the e-mails sent to Harvey, the order of protection entered by the court against Valentine, and the recorded audio from YouTube. The hearing officer also determined that CHA had established by a preponderance of the evidence that Valentine failed to supply the CHA with requested information regarding her business interests. The hearing officer stated that the CHA had sent a request to Valentine for certain business documents and Valentine never supplied those specific documents. The hearing officer found that there was insufficient evidence to support the CHA's allegations of fraud and failure to report a change in income. The CHA subsequently agreed with the recommendation and terminated Valentine's housing assistance.

¶ 32    On the day the decision was issued, Valentine, proceeding *pro se*, filed a petition for writ of *certiorari* in the circuit court, requesting that the court reverse the CHA's decision. Following briefing, on February 8, 2023, the circuit court determined that Valentine had failed to meet her burden of showing the CHA's termination decision to be in error and denied Valentine's petition.

¶ 33    This appeal followed.

¶ 34                                   II. ANALYSIS

¶ 35                          A. Compliance with Supreme Court Rules

¶ 36    Initially, this court has taken with the case the CHA's motion to dismiss based on Valentine's opening brief, which, the CHA maintains, fails to comply with the supreme court rules. We agree with the CHA that Valentine's brief falls short of compliance with our supreme court rules, particularly Rules 341 and 342, in a number of ways.

¶ 37    "The purpose of the rules is to require parties to proceedings before a reviewing court to present clear and orderly arguments so that the court may properly ascertain and dispose of the issues involved." *Zadrozny v. City Colleges of Chicago*, 220 Ill. App. 3d 290, 292 (1991). The supreme court rules governing appellate briefs are mandatory (*Voris v. Voris*, 2011 IL App (1st) 103814, ¶ 8), and *pro se* litigants must comply with the rules and are not entitled to more lenient treatment than licensed attorneys (*Holzrichter v. Yorath*, 2013 IL App (1st) 110287, ¶ 78).

¶ 38    Valentine's opening brief first violates the rule governing the format of appellate briefs. Under Supreme Court Rule 341(a), the text in a brief must be 12-point typeface and double-spaced with 1 1/2 inch margins on the left side and 1 inch on the other three sides. Ill. S. Ct. R. 341(a) (eff. Oct. 1, 2020). The text in Valentine's brief is 10.5-point typeface and all of her margins are under 1 inch. If the appropriate font-size and margins had been used, Valentine's brief would have been well over 50 pages, in violation of Rule 341(b), which limits opening briefs to 50 pages, unless a motion is made to file a brief in excess of that limit. See Ill. S. Ct. R. 341(b). Valentine's reply brief similarly violates our supreme court rules by using 10.5-point typeface and incorrect margins.

¶ 39    Next, Valentine's brief does not include citations to the record in either her statement of facts or argument sections in violation of Rule 341(h)(6) and (7). Ill. S. Ct. R. 341(h)(6) (stating that the facts necessary to an understanding of the case must include "appropriate reference to the pages of the record on appeal"); R. 341(h)(7) (stating that contentions must include "citation of

the authorities and the pages of the record relied on"). Her reply brief suffers from the same deficiency. We note that the record in this case has five volumes, each containing several hundred pages, as well as a report of proceedings from the informal hearing. Accordingly, citations to the record are imperative here and "it is not our duty to search the record for material upon which to base a reversal." *Farewell Construction Co. v. Ticktin*, 84 Ill. App. 3d 791, 802 (1980). Additionally, the statement of facts in Valentine's opening brief contains impermissible argument and comment in violation of Rule 341(h)(6). Ill. S. Ct. R. 341(h)(6) (requiring statement of facts to contain the facts of the case "state[d] accurately and fairly without argument or comment").

¶ 40    Valentine's argument section is even more troublesome. Rule 341(h)(7) requires the argument section to "contain the contentions of the appellant and the reasons therefor[.]" Ill. S. Ct. R. 341(h)(7). Further, "[a]n issue that is not clearly defined and sufficiently presented fails to satisfy [Rule 341(h)(7)]." *Cwik v. Giannoulias*, 237 Ill. 2d 409, 423 (2010). Valentine's argument section consists of more than 40 pages of disconnected, inchoate, and repetitive allegations, as well as pages of text explaining VAWA and the effects of domestic violence. We are unable to discern the nature of some of her arguments, which appear wholly irrelevant to CHA's termination decision and are not supported by facts from the record. She also cites to a number of statutory provisions that are not applicable to this appeal. Her reply brief is much the same. It is axiomatic that a reviewing court "have the issues on appeal clearly defined with pertinent authority cited and a cohesive legal argument presented." *In re Marriage of Solano*, 2019 IL App (2d) 180011, ¶ 70 (citing *Walters v. Rodriguez*, 2011 IL App (1st) 103488, ¶ 5). Here, Valentine has effectively foisted upon this court the burden of argument and research. See *Hall v. Gold Naper Hospitality, LLC*, 2012 IL App (2d) 111151, ¶ 13 (stating that the appellate court is not a depository into which a party may dump the burden of research).

¶ 41    Finally, in Valentine's "Table of Authorities" section, she cites to a number of documents, websites, articles, lawsuits, etc., that are not part of the record on appeal. A party may not rely on matters outside the record to support its position on appeal. *Keener v. City of Herrin*, 235 Ill. 2d 338, 346 (2009); see also *Jenkins v. Wu*, 102 Ill. 2d 468, 483 (1984) ("[M]atters not properly in the record will not be considered on review."). Moreover, in contravention of Rule 341(h)(1), her points and authorities section do not pinpoint the pages of her brief where they are discussed. See Ill. S. Ct. R. 341(h)(1) (stating that the points and authorities section must include "a reference to the page of the brief on which each heading and each authority appear"). Valentine also filed more than 50 attachments with her opening brief, many of which were not presented at the informal hearing, are irrelevant to the issues involved in this case, and have dates occurring after the administrative hearing took place. See *Denny v. Haas*, 197 Ill. App. 3d 427, 430 (1990) ("[A]ttachments to briefs which are not otherwise of record are not properly before a reviewing court and cannot be used to supplement the record."). It appears that these documents served as her appendix; however, she fails to follow Rule 342's parameters for an appendix. Rule 342 mandates that an appellant's brief include "as an appendix, *** a complete table of contents, with page references, of the record on appeal" and "pleadings or other materials from the record which are the basis of the appeal." Ill. S. Ct. R. 342(a) (eff. Oct. 1, 2019). Her "appendix" is in no way compliant with that rule. Thus, these impermissible attachments and list of authorities are also in contravention of the supreme court rules.

¶ 42    Although Valentine's opening brief and reply brief contain a number of other defects, we need not enumerate each and every one. Suffice it to say, her briefs are noncompliant with our supreme court rules.

¶ 43    Where a reviewing court is faced with an inadequate brief, the court has the discretion to strike the brief and dismiss the appeal. *Holzrichter*, 2013 IL App (1st) 110287, ¶ 77. We should only dismiss an appeal "where the violations preclude or interfere with our review[.]" *Ammar v. Schiller, DuCanto and Fleck, LLP*, 2017 IL App (1st) 162931, ¶ 11. Here, although the deficiencies in Valentine's briefs render it more difficult to review her appeal, we have the benefit of a cogent appellee's brief, and thus, we decide, within our discretion, to address the merits of Valentine's appeal. See *Zadrozny*, 220 Ill. App. 3d at 293. Accordingly, the CHA's motion to dismiss the appeal is denied, and, despite the failure of Valentine's brief to comply with our supreme court rules, we will consider the merits of the appeal but will disregard any improper, unsupported, or inaccurate contentions. See *Spangenburg v. Verner*, 321 Ill. App. 3d 429, 432 (2001).

¶ 44                                  B. CHA's Termination Decision

¶ 45    The CHA operates under the Illinois Housing Authorities Act. 310 ILCS 10/1 *et seq.* (West 2022). The CHA has not adopted the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2022)) and has not provided any other method to review the agency's decision. Thus, a party may ask a circuit court to review the decision by filing a common law writ of *certiorari*. *Outcom, Inc. v. Illinois Department of Transportation*, 233 Ill. 2d 324, 333 (2009); *Landers v. Chicago Housing Authority*, 404 Ill. App. 3d 568, 571 (2010). We review an appeal of a circuit court's ruling on a writ of *certiorari* "as we would any other appeal that comes to us on administrative review." *Tolliver v. Housing Authority of Cook County*, 2017 IL App (1st) 153615, ¶ 20. "The standard of review in either instance are essentially the same." *Rodriguez v. Chicago Housing Authority*, 2015 IL App (1st) 142458, ¶ 13. We review the agency's decision and the record of administrative proceedings, not the circuit court's decision. *Lipscomb v. Housing Authority of Cook County*, 2015 IL App (1st) 142793, ¶ 11. Further, "[i]t [is] the hearing officer's duty to determine the credibility

of the witnesses and the weight afforded their testimony." *East St. Louis District No. 189 v. Hayes*, 237 Ill. App. 3d 638, 647 (1992).

¶ 46 Before turning to the merits, we make abundantly clear that the only exhibits that we will consider are those that were properly submitted to the hearing officer prior to the adjournment of the hearing on August 30, 2022. Those include the 21 documents the CHA submitted in its hearing package, Valentine's post-hearing documents, and the documents attached to the CHA's post-hearing response. We may not consider new or additional evidence beyond what was originally presented at the administrative hearing. *Baker v. Ill. Department of Employment Security*, 2014 IL App (1st) 123669, ¶ 23. Thus, exhibits submitted to the circuit court or this court outside of those identified exhibits will not be considered.

¶ 47 Regarding Valentine's arguments on appeal, we will only address those which are relevant to the CHA's termination decision.

¶ 48 Valentine first argues, generally, that the termination decision was clearly erroneous where the findings were not sufficiently specific, there were no credibility findings, and the record does not support the termination of her voucher. The first two assertions are plainly belied by the record before us. As to the hearing officer's factual findings, although we are unaware of any requirement of the specificity of the findings (and Valentine points us to none), it is clear that the findings were sufficiently specific. The hearing officer found that Valentine used "abusive language and threatened the [CHA] employee" in the YouTube video which was attached to the July 28, 2022 e-mail; that as a result of the July e-mails, Harvey sought and obtained an order of protection from the circuit court; that Valentine "engaged in threatening and abusive behavior toward CHA personnel both by written and verbal contact"; that the CHA requested business records for a number of businesses Valentine appeared to be involved in and IRS tax transcripts from 2018 to

2021; and that Valentine did not provide the CHA with the requested documents. We cannot say that these findings lack specificity. As to credibility findings, Valentine's assertions are clearly refuted as the hearing officer specifically stated that it found Valentine "less than credible[.]" We now turn to Valentine's general assertion that the record did not support the hearing officer's termination decision.

¶ 49    There are three types of questions that a court may face on administrative review, each accompanied by a different standard of review. *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 211 (2008) (citing *Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 205 (1998)). "An administrative agency's findings and conclusions on questions of fact are deemed *prima facie* true and correct[,]" and this court is limited to determining whether such factual findings are against the manifest weight of the evidence. *Id.* "An administrative agency's factual determinations are against the manifest weight of the evidence if the opposite conclusion is clearly evident." *Id.* In contrast, an agency's decision on a question of law is reviewed *de novo* and this court's review is independent and not deferential. *Id.*

¶ 50    However, when, as in the case before us, an administrative agency's decision involves "an examination of the legal effect of a given state of facts[,]" it presents a mixed question of fact and law. *Cinkus*, 228 Ill. 2d at 211. On review of such a question, we will not reverse the agency's decision unless it is "clearly erroneous," which occurs only "when the reviewing court is left with the definite and firm conviction that a mistake has been made." (Internal quotations omitted.) *Id.*

¶ 51    As stated, in the termination decision, the hearing officer found that Valentine violated the family obligations as a participant in the HCV program by both failing to provide true and accurate information to the CHA when requested and engaging in threatening behavior towards CHA

personnel. For the following reasons, we conclude that there is ample support in the record to support these findings and thus, the decision was not clearly erroneous.

¶ 52    The Code of Federal Regulations sets forth the rules and regulations for the administration of the CHA's HCV program. Under section 982.552 of the Code, the CHA "may at any time *** terminate program assistance for a participant" if the participant violates any of the family obligations under the program. 24 C.F.R. § 982.552(c)(1)(i) (2016). Section 982.551 sets forth the family obligations under the program. 24 C.F.R. § 982.551. Subsection (b) states that participants must supply any information requested by the CHA for use in reexamination of a family's income and "[a]ny information supplied by the family must be true and complete." 24 C.F.R. § 982.551(b)(2), (4). Additionally, section 982.552 specifically provides that assistance may be terminated "[i]f the family has engaged in or threatened abusive or violent behavior toward [CHA] personnel." 24 C.F.R. § 982.552(c)(1)(ix). As stated previously, these two discretionary grounds for termination are also set forth in the voucher contract and its addendum, both of which were signed by Valentine.

¶ 53    In the termination decision, the hearing officer expressly set forth the applicable standard in determining whether a violation occurred. In particular, the CHA's administrative plan provides that:

> "The CHA will use the concept of the preponderance of the evidence as the standard for making all informal hearing decisions. *Preponderance of the evidence* is defined as evidence which is of greater weight or more convincing than the evidence which is offered in opposition to it; that is, evidence which as a whole shows that the fact sought to be proved is more probable than not." CHA admin. plan ch. 16-III.B (2021) (https://cha-

assets.s3.us-east-2.amazonaws.com/s3fs-public/2023-

11/FY2024%20Administrative%20Plan_Clean.pdf).

¶ 54    The hearing officer determined that the CHA proved by a preponderance of the evidence that Valentine failed to provide the CHA with the requested business and tax documents set forth in its two notices. Our review of the record shows sufficient evidence to support that finding. The CHA learned that Valentine was operating a business that had not been disclosed. As a result, the CHA investigated Valentine's business interests and discovered two other businesses that she had never disclosed to the CHA. Subsequently, the CHA sent two separate notices to Valentine requesting specific business records. The CHA claimed that they never received those documents. Valentine disputed that claim and instead asserted at the hearing that she had submitted business documents to the CHA. After the hearing, she submitted e-mails to support her argument that the documents had been submitted. In response, The CHA agreed that Valentine did submit some business documents but failed to submit any tax documents for 2021 and, in any case, the tax documents she submitted for the other years were not the requested "IRS tax transcripts." The CHA claimed IRS tax transcripts were necessary because self-prepared tax returns were not reliable. The record before us supports CHA's assertions. Thus, we agree with the hearing officer that the evidence showed by a preponderance of the evidence that Valentine did not comply with the CHA's request for documents and thus violated the family obligation to submit true and complete information to the CHA.

¶ 55    The hearing officer also determined that the CHA demonstrated by a preponderance of the evidence that Valentine engaged in threatening behavior towards CHA personnel. The CHA first presented two e-mails sent by Valentine in July 2022. The July 28, 2022 e-mail was sent to the Chicago police and a number of other individuals were copied on the e-mail, including two CHA

contractors, Frills and Harvey. The e-mail referred to Harvey by name and stated: "Question: Have you ever looked into the eyes of a shooter? Might make you piss yourself in fear, you feel me?". The July 29, 2022 e-mail was sent directly to Harvey and Frills. In the e-mail, Valentine accused Harvey of harassment and warned Harvey that she had a background in private investigation and she knew where Harvey lived. Based on these two e-mails, Harvey subsequently sought an order of protection from the circuit court, and the court issued one against Valentine on August 2, 2022. Frills testified that, after the order of protection was entered, Valentine continued to send e-mails to Harvey, on which Frills was copied, in violation of the no-contact order. Additionally, Frills testified about a YouTube video that Valentine included a link to in her July 28 e-mail. According to Frills, the video was a recording of an interaction between Valentine and Doreen Green, a CHA employee. Frills testified that the video was posted publicly to Valentine's YouTube profile and she recorded the video. The video was later played during the hearing, and the transcript from the hearing shows that Valentine stated that she would "beat [Green] like her child." Despite Valentine's contention on appeal that "any allegations of threats or danger to staff are unfounded and outright false," at the hearing, Valentine acknowledged that she made that statement, expressed remorse, and stated that she was under duress at that time. Based on this evidence, the hearing officer concluded that Valentine had made threats of violence towards CHA personnel.

¶ 56    The CHA administrative plan, as well as the voucher addendum, defines "threatening" as "oral or written threats or physical gestures that communicate intent to abuse or commit violence." Valentine's statement in the YouTube video clearly satisfies this definition where Valentine threatened that she would physically injure the CHA staff member. This alone would be sufficient for a finding of a violation of the family obligations, but the July 2022 e-mails, Harvey's

subsequent order of protection, and Valentine's violation of that order, provide further support for the hearing officer's finding.

¶ 57    Valentine contests this finding by attempting to explain the context for her e-mails. She contends that the July 28 e-mail was not directed at Harvey and the July 29 e-mail was not intended as a threat towards Harvey. In particular, she claims that the July 28 e-mail was directed at the police because she had just witnessed a shooting and she took photographs of the shooter. As to the July 29 e-mail, she asserts that she had met a man at a hotel who knew Harvey and she believed this to be evidence of Harvey's stalking and harassment of Valentine. However, the hearing officer found Valentine to be "less than credible," and we are deferential towards an agency's credibility determinations (*Ramirez v. Andrade*, 372 Ill. App. 3d 68, 73 (2007)). Valentine has not presented this court with any reason to disagree with that determination; rather, we point to her claim during the hearing that she did not make the threatening statement on the YouTube video, which was proven untrue when the video was played. Even if we take as true Valentine's assertion that the July 28 e-mail was directed at police regarding a shooting she witnessed, that does not explain the preceding sentence in the e-mail, which states: "For all practical purposes, Ms. Doreen admits I was referred to her by Shalisa Harvey, further proving conspiracy to cause harm and/or commit fraud while employed by CHA." It is reasonable to infer that the sentences contained in the same e-mail are related to one another. Moreover, Valentine's explanations for the July 29 e-mail are not borne out by the substance of the e-mails. At no point in that e-mail does she reference this alleged man. Additionally, there is no correlation between Valentine's explanation involving this alleged man and her warning to Harvey that she has a background in private investigation. Thus, both of these e-mails suggest threats of violence, and we presume that the circuit court came to the same conclusion when it entered an order of protection on behalf of Harvey against Valentine

based on those e-mails. As such, Valentine's assertion that the allegations of threats are unfounded and false is belied by the record, and the hearing officer's finding that Valentine violated the family obligations by threatening CHA personnel was not clearly erroneous.

¶ 58    Nonetheless, Valentine asserts that she has not been found guilty of any crimes of threats towards CHA personnel. This argument is without merit. This is not a criminal action and there is no requirement that the CHA prove Valentine's guilt of any crimes, only that the preponderance of the evidence supports the alleged violations of the family obligations. In fact, the Code provides that housing assistance may be terminated for criminal activity by a participant if the CHA "determines, based on a preponderance of the evidence, that the household member has engaged in the activity, regardless of whether the household member has been arrested or convicted for such activity." 24 C.F.R. § 982.553(c) (2016). As we stated above, the CHA showed by a preponderance of the evidence that Valentine engaged in threatening behavior towards CHA personnel.

¶ 59    Accordingly, we conclude that the CHA's termination decision was not clearly erroneous.

¶ 60                                    C. Application of VAWA

¶ 61    Valentine also devotes a large portion of her brief to discussion of VAWA and her status as a domestic violence victim. To that end, she argues that her voucher was erroneously terminated because she is protected under VAWA. To support this contention, she points to her VAWA documentation. Valentine further contends that it was error for the hearing officer to ignore VAWA and Valentine's status as a victim of domestic violence.

¶ 62    Originally enacted in 1994, VAWA is a comprehensive statute designed to combat violence against woman. See 34 U.S.C. §§ 12291 *et seq* (2018). In 2005, it was reauthorized and expanded to include, among other safeguards, protection for domestic violence victims participating in

covered housing programs. 34 U.S.C. § 12491. Specifically, VAWA states a "tenant of housing assisted under a covered housing program may not be *** terminated from participation" in the program on the basis that the tenant "is or has been a victim of domestic violence, dating violence, sexual assault, or stalking[.]" 34 U.S.C. § 12491(b)(1); see also 24 C.F.R. § 5.2005(b) (2016). Notwithstanding that provision, VAWA provides that the statute does not limit a public housing agency's authority to "terminate assistance to a tenant for any violation not premised on an act of domestic violence, dating violence, sexual assault, or stalking," but the agency may not subject a domestic violence victim to a more demanding standard than other tenants in determining whether to terminate. 24 C.F.R. § 5.2005(d)(2); 34 U.S.C. § 12491(b)(3)(C)(ii); see also CHA admin. plan, ch. 2-III.A (2021) (https://cha-assets.s3.us-east-2.amazonaws.com/s3fs-public/2023-11/FY2024%20Administrative%20Plan_Clean.pdf) ("The CHA can terminate a participant for any violation of the program or the lease that was not based on domestic violence, dating violence, sexual assault or stalking.").

¶ 63    Initially, we note that we do not doubt Valentine's VAWA documentation that she submitted to the CHA nor do we dispute the dangers and difficulties that domestic violence victims face. However, in response to that documentation, the CHA Fair Housing Director stated that there was "no nexus between [Valentine's] VAWA claim and her failure to report business income to CHA, failure to provided requested documents to CHA, or her oral and written threats that communicate intent to abuse or commit violence toward CHA and its vendor staff." Based on the evidence in the record, we agree. Valentine's testimony failed to explain how her status as a domestic violence victim resulted in her threats of violence towards CHA personnel and failure to accurately report business income. She made no connection between her VAWA documentation, identifying her abuser, and the violations of CHA family obligations.

¶ 64    However, in her brief on appeal, Valentine asserts that Harvey is her abuser and she has suffered violence perpetrated by Harvey. First, this contention was not raised at the informal hearing. It is well established that an argument, issue, or defense not presented in an administrative hearing is procedurally defaulted and may not be raised for the first time on administrative review. *Cinkus*, 228 Ill. 2d at 212. As such, the argument is forfeited and cannot be raised on appeal. Second, even if not forfeited, this argument lacks merit. There is no evidence in the record supporting such allegations against Harvey other than Valentine's own self-serving statements contained in many of her e-mails, most of which are not part of the administrative record. Moreover, VAWA only applies to intimate partners or spouses, of which Harvey is demonstrably neither. See 34 U.S.C. § 12291(12). As such, Valentine failed to allege, and failed to prove, any facts showing that VAWA was implicated in the CHA's decision to terminate her participation in the HCV program. Because Valentine's VAWA argument is meritless, we find that the hearing officer's failure to discuss her VAWA status in detail in the termination decision was not error.

¶ 65                          D. Ancillary Arguments

¶ 66    Next, Valentine argues that the hearing officer rejected or ignored the documents that she provided and this court should consider the excluded evidence. This argument is without merit where the hearing officer expressly permitted Valentine additional days to submit relevant documents prior to adjourning the informal hearing. In the termination decision, the hearing officer stated that Valentine was given leave to submit two e-mails, one dated May 20, 2022 and one dated July 27, 2022. The hearing officer received those e-mails, as well as a number of other documents. In a footnote, the hearing officer identified those documents and explained that some of the documents were irrelevant. Regarding e-mails related to Valentine's submission of tax documents, the hearing officer confirmed that Valentine sent tax information but it was nonresponsive to the

CHA's document requests. Later in the decision, the hearing officer stated that the July 27, 2022 e-mail was not persuasive in supporting Valentine's denial of the intended direction of July 28, 2022 e-mail. Thus, it is clear from the termination decision that the hearing officer accepted and considered Valentine's submitted documents.

¶ 67 Valentine also contends that the YouTube video was erroneously admitted without Valentine's knowledge or ability to respond. We do not find that to be the case. Certainly, Valentine had knowledge of the video, as she was the one who created and posted it to YouTube. The CHA did not include the video as an exhibit because it intended to rely solely on Frills' testimony to provide evidence of Valentine's statement made toward CHA personnel. However, the YouTube link appears in one of e-mails submitted by the CHA in its ITT package. After Valentine's objection to the testimony, the hearing officer allowed the CHA to play the video during the hearing with all parties present. See 24 C.F.R. 982.555(e)(5) (The procedures for an informal hearing under the HCV program allow for evidence to be considered "without regard to admissibility under the rules of evidence applicable to judicial proceedings"). As such, she clearly had knowledge of the video and the ability to respond to the video where she testified after the video was played at the hearing.

¶ 68 Additionally, Valentine contends that she "was not given proper notice of hearing and/or time to notice witnesses, submit documents[,] and/or cross examine any witnesses that would provide testimony during [the] hearing." Again, we find this argument baseless. The record shows that Valentine was sent notice of the hearing and that notice contained her rights, including the right to submit documents and to present witnesses. Valentine was present for the hearing, and the transcript from the hearing shows that she was given the opportunity to cross-examine witnesses

and she did so. She was also given the opportunity to submit documents after the hearing took place. As such, this argument fails.

¶ 69    Finally, Valentine argues that the CHA did not schedule an informal hearing within 15 days, which, she maintains, is required. Her argument is simply incorrect. She cites to the CHA Leaseholder Contract for support; however, such a contract is applicable to CHA-owned units, not CHA-subsidized units, as in the case before us. Additionally, the regulation to which she cites, section 966.50, is the public housing grievance procedure and is not related to the HCV program. Rather, section 982.555 governs informal hearings under the HCV program. It provides that the CHA must give a participant an opportunity for an informal hearing to consider whether the CHA's decision to terminate assistance is "in accordance with the law, HUD regulations and [CHA] policies[.]" 24 C.F.R. 982.555(a)(1)(iv). Subsection (d) provides that "[w]here a hearing for a participant family is required under this section, the [CHA] must proceed with the hearing in a reasonably expeditious manner upon the request of the family." 24 C.F.R. 982.555(d). CHA sent an amended ITT notice on July 29, 2022, after Valentine failed to provide requested business documents and the July 2022 e-mails were brought to the CHA's attention. The hearing was held less than a month later. As such, we see no violation in the timing of the informal hearing.

¶ 70    As a final note, we conclude that any additional arguments made by Valentine in her brief were either irrelevant to the issues related to the CHA's termination action, were based on matters outside the administrative record, or were incomprehensible to this court. See *Solano*, 2019 IL App (2d) 180011, ¶ 70 (stating that points not clearly defined with pertinent authority cited and cohesive legal argument presented "are forfeited" (citing *Walters*, 2011 IL App (1st) 103488, ¶ 5)).

¶ 71    Accordingly, we find that all of Valentine's arguments on appeal fail and we affirm the CHA's termination decision.

¶ 72                                    III. CONCLUSION

¶ 73    For the reasons stated, we affirm the judgment of the circuit court.

¶ 74    Affirmed.